# IN THE SUPREME COURT OF TEXAS

═══════════════════════
Nos. 11-0283, 11-0652
═══════════════════════

SUSAN COMBS, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS,
AND GREG ABBOTT, ATTORNEY GENERAL OF THE STATE OF TEXAS,
PETITIONERS,

v.

HEALTH CARE SERVICES CORPORATION, RESPONDENT

═══════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
═══════════════════════════════════════════════════════

**Argued February 27, 2013**

JUSTICE WILLETT delivered the opinion of the Court.

This tax-refund case concerns the Tax Code's sale-for-resale exemption, which grants purchasers of taxable goods and services a sales-tax exemption if they resell the items (since the ultimate purchaser will pay any tax due). Here, a government contractor seeks sales-tax refunds for purchases used to administer federal health-insurance programs. The question is one of scope: What categories of purchases qualify for the exemption?

Applying the Legislature's sale-for-resale definition and exemption language, we believe the contractor here is entitled to most of the claimed refunds. There are three main categories of goods and services for which refunds are claimed: tangible personal property, taxable services, and leases of tangible personal property. We hold that the exemption applies to the tangible personal property and taxable services, but not to the leases of tangible personal property, for the following reasons:

-     <u>Tangible Personal Property</u>. The exemption applies even when, as here, the resale consists of bare title transfer of tangible personal property that is consumed by the taxpayer to perform nontaxable services. This holding reaffirms long-standing precedent that allowed federal contractors to claim the sale-for-resale exemption for tangible personal property subject to automatic title transfer. We hasten to note, however, that a 2011 Tax Code amendment likely alters this result moving forward.

-     <u>Taxable Services</u>. Sale-for-resale of a taxable service can occur, as here, by directing that the service be performed for another party in return for consideration from that party.

-     <u>Leases of Tangible Personal Property</u>. These fall outside the sale-for-resale exemption, as they are not resold unless they are re-leased or transferred in some other way to another purchaser.

Finally, we hold that reimbursement of a tax is not the same as collection of a tax. Thus, the requirement that a taxpayer who claims a refund show he has not collected the tax from someone else does not also require the taxpayer to show he has not been reimbursed for the tax. Accordingly, we affirm the court of appeals' judgment on all but the lease issue, which we reverse and remand to the trial court for further proceedings.

## I. Background

Health Care Services Corporation and its predecessor-in-interest, Blue Cross and Blue Shield of Texas, Inc. (collectively HCSC), contracted with the federal government to administer two health-insurance programs.[1] While performing these contracts, HCSC incurred expenses that were reimbursed by the federal government.

---

[1] HCSC performed administrative services for two types of health insurance programs: Medicare and the Federal Employees Health Benefits Program. However, the contracts for both programs were virtually identical for the purposes of this opinion. So, all references in this opinion to "the contracts" are references to all contracts related to both programs, unless otherwise indicated.

HCSC paid sales and use tax on some of these expenses and applied for a refund under the sale-for-resale exemption.[2] The Comptroller denied the refund. HCSC brought two separate tax-refund suits, the first covering December 1, 1988 through December 31, 1998, and the second covering January 1, 1999 through December 31, 2003. The two cases were nearly identical except for minor variations in the specific property and services for which HCSC sought a sales-tax refund.[3] However, in both cases, HCSC claimed the sale-for-resale exemption for three general categories of property and services it used to perform the contracts: (1) tangible personal property (such as chairs, printers, and office supplies); (2) taxable services (such as printer repair services, landscape maintenance, and copier maintenance); and (3) leases of certain tangible personal property (such as leases of computers, audio equipment, and printers).

In both cases, the court of appeals affirmed trial-court decisions that HCSC was entitled to the claimed refunds.[4] We consolidated the cases and issue this joint decision.

## II. Discussion

The Comptroller argues the sale-for-resale exemption is inapplicable and also that HCSC should have to prove the federal government did not already reimburse it for the sales tax for which it requests refunds.

---

[2] For clarity, we will abbreviate "sales and use tax" to just "sales tax."

[3] In the first trial, the specific property or services were: "Utilities," "Taxable Services on Tangible Personal Property," "Allowable," "Capitalized Assets," "Leases," "Maintenance on Tangible Personal Property," and "Software/Software Maintenance." In the second trial, the specific property or services were: "Utilities," "Taxable Services on Tangible Personal Property," "Taxable Services on Real Property," "Allowable," "Leases," "Maintenance on Tangible Personal Property," "Maintenance on Real Property," and "Software/Software Maintenance."

[4] ___ S.W.3d ___; ___ S.W.3d ___.

We affirm in part, reversing solely on the leases of tangible personal property.  HCSC is entitled to a sales-tax refund for the tangible personal property and taxable services but not for the leases of tangible personal property.  Also, HCSC need not show whether the federal government reimbursed it for the taxes.

## A.  Tangible Personal Property

At all relevant times, the Tax Code defined sale for resale as a sale of:

> tangible personal property or a taxable service to a purchaser who acquires the property or service for the purpose of reselling it [in certain geographical locations] in the normal course of business in the form or condition in which it is acquired or as an attachment to or integral part of other tangible personal property or taxable service.[5]

The statute applies to the tangible personal property here.  HCSC purchased the "tangible personal property" for the purpose of "reselling it . . . in the normal course of business in the form or condition in which it [was] acquired."  The trial court found that HCSC's normal course of business was performing federal government contracts, and the resale furthered those contracts.  Further, the tangible personal property was automatically resold to the federal government as soon as it was acquired due to the title-transfer provisions.[6]  Title transfer for consideration is one type of "sale."[7]

---

[5]  Act of May 27, 2007, 80th Leg., R.S., ch. 1266, § 2, 2007 Tex. Gen. Laws 4234, 4234 (amended 2011) (current version at TEX. TAX CODE § 151.006(a)(1)).

[6]  We note that the trial court concluded that the title-transfer provisions apply to all the tangible personal property transfers.  The Comptroller does not contest this conclusion or argue that the title-transfer provisions were limited to certain types of transactions.  Therefore, we treat all the tangible personal property purchases identically without independently analyzing whether the title-transfer provisions were applicable to all the transactions.  We note, however, that the different contracts incorporated different title-transfer provisions.  The earlier Federal Employees Health Benefits Program contracts incorporated the title-transfer provision found in Federal Acquisition Regulation 52.245-2, while later, amended Federal Employees Health Benefits Program contracts incorporated the title-transfer provision found in Federal Employees Health Benefits Acquisition Regulation 1652.245-70.  The Medicare contracts all incorporated the title-transfer provision found in Federal Acquisition Regulation 52.245-5.  As the parties have not

4

Therefore, the property was resold (through title transfer) in the "form or condition in which it [was] acquired": the resale was automatic upon acquisition, so, naturally, the property was resold before HCSC had any chance to alter it.

The Comptroller asserts that Section 151.006(a)(1) requires the application of an "essence of the transaction" test. The Comptroller's argument is essentially that the exemption should only apply if the *primary* purpose of the original sale is to resell "in the form or condition in which it is acquired or as an attachment to or integral part of other tangible personal property or taxable service." Here, the primary purpose of the original sale was to acquire property that would be consumed in performing a nontaxable service, so the exemption should not apply. This restrictive interpretation collides with the statutory text.

The exemption does not say (or even intimate) that the *primary* purpose of the sale must be for a particular kind of resale.[8] The statute merely says the sale must have "the purpose" of reselling in one of the specified ways; not "the primary purpose," "the main purpose," or "the important purpose." Here, HCSC bought tangible personal property for *the purpose* of transferring its title to

raised the issue, we express no opinion on whether these different title-transfer provisions properly apply to all of the tangible personal property transfers at issue here. *See* TEX. R. APP. P. 55.2(i).

[7] TEX. TAX CODE § 151.005(1).

[8] We recently noted that "in the area of tax law, like other areas of economic regulation, a plain-meaning determination should not disregard the economic realities underlying the transactions in issue," and cited federal and Texas tax cases referencing "economic realities" or the "essence of the transaction." *Combs v. Roark Amusement & Vending, L.P.*, ___ S.W.3d ___, ___ & n.14 (Tex. 2013). However, we also made clear that if the statute does "not impose, either explicitly or implicitly," the "extra-statutory requirement" urged by the Comptroller, "we decline to engraft one—revising the statute under the guise of interpreting it." *Id.* at ___. We did not suggest that, in the guise of considering the economic realities or essence of the transaction, courts were authorized to impose an entirely new requirement for a tax exemption that simply is not found in the language of the statutory exemption.

the federal government; we know this was the purpose because it was an unavoidable result given the automatic title-transfer provision. It is irrelevant that a second purpose of the sale was to acquire property that would be consumed in performing the nontaxable services. Taking the Legislature at its word and giving the statute its plain meaning, the definition and exemption apply.

This plain-text analysis reaffirms our holding in *Day & Zimmerman, Inc. v. Calvert*.[9] That case involved a taxpayer, Day & Zimmerman, that contracted with the federal government "for the loading, assembling and packaging of ammunition and related components as well as the handling of the mechanics of procurement of all necessary materials, supplies, equipment and services."[10] The contract between Day & Zimmerman and the government contained an automatic title-transfer provision similar to the one here.[11] The Comptroller made a deficiency determination against Day & Zimmerman for the sales tax paid for "the tangible personal property, not including any of the component parts that went into the finished product, purchased and consumed by the operating contractor in the performance of its contract with the Federal Government."[12] We held that the sales tax for this property had to be refunded to Day & Zimmerman because the transaction fell within the sale-for-resale exemption. The sale happened when the tangible personal property was physically transferred from the vendor to Day & Zimmerman.[13] Then, because the definition of "sale" included

---

[9] 519 S.W.2d 106 (Tex. 1975)

[10] *Id.* at 108.

[11] *Id.* at 110.

[12] *Id.* at 108.

[13] *Id.* at 109–11.

6

title transfer for consideration, the resale happened when title to the property transferred from Day & Zimmerman to the federal government.[14] *Day & Zimmerman* is thus completely consistent with our decision today, both in its holding and its reasoning.

We find unpersuasive the Comptroller's attempt to distinguish *Day & Zimmerman*. The Comptroller argues that *Day & Zimmerman* involved a contract where the "essence of the transaction" was selling goods, whereas the essence of the transaction here is selling nontaxable services to which Section 151.006(a)(1) does not apply. So, the Comptroller says *Day & Zimmerman* is consistent with her proposed essence of the transaction test. The difficulty with this reasoning is simply stated: *Day & Zimmerman* never mentions or alludes to any such test. Moreover, it's anything but clear whether the essence of the transaction was reselling tangible personal property (ammunition) or reselling services (assembly and packaging of ammunition).[15] If the essence of the transaction really mattered, we would expect a more detailed description of the contract's "essence." *Day & Zimmerman* did not contemplate an "essence of the transaction" test because no such discussion exists. Instead, *Day & Zimmerman* stands for the proposition that automatic title transfer upon purchase qualifies for the sale-for-resale exemption. *Day & Zimmerman* cuts squarely in HCSC's favor due to the analogous title-transfer provisions.

The Comptroller next urges that *Day & Zimmerman* was abrogated by amendments to the sale-for-resale statute. While conceding that "sale" is still defined to include bare transfer of title

---

[14] *Id.* at 110.

[15] *See id.* at 108.

of tangible personal property for consideration,[16] she asserts that two amendments have changed the legal landscape and rendered *Day & Zimmerman* irrelevant: (1) a change to the definition of "sale for resale," and (2) a new provision dealing with certain transactions that mix the resale of tangible personal property with the resale of taxable services. Upon careful examination of the amendments, the Comptroller's argument fails.

### 1. The Slight Definitional Change to "Sale for Resale" Does Not Abrogate Day & Zimmerman and Defeat the Exemption

In *Day & Zimmerman*, the statutory definition of sale for resale was:

> A sale of tangible personal property to any purchaser who is purchasing said tangible property for the purpose of reselling it [in certain geographical locations] in the normal course of business either in the form or condition in which it is purchased, or as an attachment to, or integral part of, other tangible personal property.[17]

The statutory definition relevant to this case reads:

> [A sale of] tangible personal property or a taxable service to a purchaser who acquires the property or service for the purpose of reselling it [in certain geographical locations] in the normal course of business in the form or condition in which it is acquired or as an attachment to or integral part of other tangible personal property or taxable service.[18]

Studying these similar statutes, it is difficult to understand the Comptroller's argument that the statutory definition has changed so much as to revoke *Day & Zimmerman*. The new version

---

[16] *See* TEX. TAX CODE § 151.005(1).

[17] *Day & Zimmerman*, 519 S.W.2d at 109.

[18] Act of May 27, 2007, 80th Leg., R.S., ch. 1266, § 2, 2007 Tex. Gen. Laws 4234, 4234 (amended 2011) (current version at TEX. TAX CODE § 151.006(a)(1)).

merely seems to recognize the fact that some services are now taxable in Texas, whereas they were not when *Day & Zimmerman* was decided almost forty years ago.

The Comptroller's main argument appears to be that adding the words "taxable service" throughout the definition makes it clear that tangible personal property cannot be considered "resold" if the property is merely used to provide a nontaxable service. After all, says the Comptroller, the definition doesn't mention *nontaxable* services. But the *Day & Zimmerman*-era statute similarly made it clear that tangible personal property could not be considered "resold" if it was merely used to provide a service because the definition did not mention *any* services.

The Comptroller also argues that the statutory change unambiguously requires (or, in the alternative, ambiguously allows) application of the "essence of the transaction" test. The trouble with this argument, again, is that the changes since *Day & Zimmerman* say nothing about the "essence of the transaction" test. We do not see how the revisions have introduced any ambiguity into the statute that would allow application of the "essence of the transaction" test when it did not apply in *Day & Zimmerman*. In sum, the definitional changes to "sale for resale" do not statutorily abrogate *Day & Zimmerman*.

### 2. New Tax Code Section 151.302(b) Similarly Does Not Abrogate Day & Zimmerman *and Defeat the Exemption*

The Comptroller next argues that *Day & Zimmerman* was abrogated by Section 151.302(b), which provides:

9

> Tangible personal property used to perform a taxable service is not considered resold unless the care, custody, and control of the tangible personal property is transferred to the purchaser of the service.[19]

But it is uncontested in this case that HCSC is asking for a refund for tax paid on tangible personal property used to perform a *nontaxable* service because administrative services are not listed as a taxable service in Section 151.0101(a). Tangible personal property used to perform a nontaxable service is outside the exception to the exemption created by Section 151.302(b); by its own terms, that section only applies to tangible personal property used to perform a *taxable* service.

Perhaps it seems strange to distinguish between taxable and nontaxable services in Section 151.302(b). After all, if HCSC had transferred bare title to the tangible personal property and then consumed it in performing a *taxable* service, HCSC would not be entitled to a reimbursement. However, we read unambiguous statutes as they are written, not as they make the most policy sense. If a statute is worded clearly, we must honor its plain language, unless that interpretation would lead to absurd results. The Comptroller urges deference to its interpretation, but we recently canvassed our articulations of the agency-deference doctrine and formulated this test:

> We have long held that an agency's interpretation of a statute it is charged with enforcing is entitled to "serious consideration," so long as the construction is reasonable and does not conflict with the statute's language. . . . In our "serious consideration" inquiry, we will generally uphold an agency's interpretation of a statute it is charged by the Legislature with enforcing, so long as the construction is reasonable and does not contradict the plain language of the statute. . . . [T]his deference is tempered by several considerations: [the statute must be ambiguous, the

---

[19] TEX. TAX CODE § 151.302(b).

agency interpretation must be the result of formal procedures, and the interpretation must be reasonable].[20]

It is true that courts grant deference to an agency's reasonable interpretation of a statute, but a precondition to agency deference is ambiguity; "an agency's opinion cannot change plain language."[21]  There is no ambiguity about the ambiguity requirement, nor with the unassailable rule that agency interpretations cannot contradict statutory text.  Here, the Comptroller's interpretation is contrary to the Tax Code.  The statute unambiguously applies only to tangible personal property used to perform a taxable service.  Further, it is not absurd for the Tax Code to treat nontaxable services more favorably than taxable services; indeed, the Tax Code already treats nontaxable services more favorably by not taxing them.  Summing up: As Section 151.302(b) explicitly applies only to tangible personal property used to perform taxable services, we decline the Comptroller's invitation to rewrite the statute to reach nontaxable services, too.

### 3. Given the Statute's Clarity, the Comptroller's Unintended Consequences Arguments Are Unavailing

The Comptroller contends the Legislature could not have intended to exempt HCSC from sales tax for items it consumed itself.  Arguing that a plain-language interpretation of the exemption would produce unintended consequences, she asserts the "tie-pin" example: that HCSC should not be refunded sales tax on tie pins it bought to reward its employees for good work.

---

[20] *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624–25 (Tex. 2011) (internal quotation and citation omitted).

[21] *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747 (Tex. 2006).

11

We recognize that statutes, framed in general terms, can often work peculiar outcomes, including over- or under-inclusiveness, but such minor deviations do not detract from the statute's clear import. If an as-written statute leads to patently nonsensical results, the "absurdity doctrine" comes into play, but the bar for reworking the words our Legislature passed into law is high, and should be. The absurdity safety valve is reserved for truly exceptional cases, and mere oddity does not equal absurdity. A sales-tax exemption for tie pins, even if unintended, even if improvident, even if inequitable, falls short of being unthinkable or unfathomable. The absurdity backstop requires more than a curious loophole. Indeed, given the complexity of modern tax laws (and the haste with which many are enacted), whimsical examples of over- or under-inclusiveness, likely wholly unintended, doubtless abound.[22] But pointing out a quirky application is quite different from proving it was quite impossible that a rational Legislature could have intended it.

Since at least *Day & Zimmerman*, items consumed while performing a contract with a title-transfer provision have clearly been covered by the sale-for-resale exemption. If the Legislature considered this a loophole worth closing, it could have done so. In fact, lawmakers in 2011 narrowed it via Section 151.006(c), which reserves this sale-for-resale exemption to contractors that are partnering with federal national security-related agencies.[23]

---

[22] Partly because of the title-transfer provision, the federal government likely could have demanded at any time that HCSC turn over all tangible personal property that wasn't consumed yet (even the tie pins). Indeed, the trial court found that when certain HCSC contracts expired, the federal government required HCSC physically to transfer any remaining tangible personal property to the new contractor. Title transfer was not a mere sham here; it had a real-world impact on HCSC. The federal government owned the tangible personal property, even if it lacked physical control over it. It thus makes some sense to shield HCSC from the tax burden for all property purchased to carry out the contracts.

[23] *See* TEX. TAX CODE § 151.006(c) which provides:

A sale for resale does not include the sale of tangible personal property or a taxable service to a

## B. Taxable Services

The Comptroller argues that the taxable services that HCSC bought on the government's behalf fall outside the sale-for-resale exemption because the title-transfer clauses did not transfer title of the taxable services to the federal government. However, title transfer clearly is not the only way to bring about a resale. Instead, "sale" also includes "performance of a taxable service" for consideration.[24] Here, HCSC bought these taxable services (the sale). HCSC then resold the services to the government by directing that they be performed on the government's behalf with the purpose of receiving reimbursement and compensation (consideration) from the government (the resale). The sale-for-resale exemption explicitly includes the sale-for-resale of a service when it is

---

> purchaser who acquires the property or service for the purpose of performing a service that is not taxed under this chapter, regardless of whether title transfers to the service provider's customer, unless the tangible personal property or taxable service is purchased for the purpose of reselling it to the United States in a contract, or a subcontract of a contract, with any branch of the Department of Defense, Department of Homeland Security, Department of Energy, National Aeronautics and Space Administration, Central Intelligence Agency, National Security Agency, National Oceanic and Atmospheric Administration, or National Reconnaissance Office to the extent allocated and billed to the contract with the federal government.

*See also id.* § 151.006(a)(5) which provides that a "sale for resale" means:

> except as provided by Subsection (c), tangible personal property to a purchaser who acquires the property for the purpose of transferring it as an integral part of performing a contract, or a subcontract of a contract, with the federal government only if the purchaser:
> (A) allocates and bills to the contract the cost of the property as a direct or indirect cost; and
> (B) transfers title to the property to the federal government under the contract and applicable federal acquisition regulations.

Both of these subsections were added in 2011. Act of June 28, 2011, 82d Leg., 1st C.S., ch. 4, § 12.01, 2011 Tex. Gen. Laws 5263, 5263 (current version at TEX. TAX CODE § 151.006).

[24] TEX. TAX CODE § 151.005(3).

resold "in the form or condition in which it is acquired."[25]  Here, HCSC bought the services and then immediately resold them to the federal government, so the services were resold in the same form as they were acquired, thus qualifying for the sale-for-resale exemption.

The Comptroller attempts to recharacterize HCSC's sale-for-resale of services as sale-for-resale of service *contracts*.  However, the trial court's findings of fact include findings that the services at issue were performed on behalf of the federal government and that HCSC was compensated for them.  Therefore, because the Comptroller has not challenged the evidentiary sufficiency of these factual findings, we accept them as a true characterization of the transfer.  That is, the resale to the government was the performance of the services for consideration, not merely a resale of service contracts.

## C. Leases of Tangible Personal Property

The Comptroller further argues that the leases of tangible personal property fall outside the sale-for-resale exemption.  After all, the Comptroller says, leases themselves are not tangible personal property, so sale-for-resale of a lease is not the sale-for-resale of tangible personal property.  But "lease" is statutorily included in the definition of "sale."[26]  Therefore, lease-for-(re)lease of tangible personal property falls within the definition of sale-for-resale of tangible personal property.

That said, there is no evidence here that HCSC leased the property for the purpose of *re-leasing* it.  That is, using the property for the federal government contract is not the same as formally

---

[25] Act of May 27, 2007, 80th Leg., R.S., ch. 1266, § 2, 2007 Tex. Gen. Laws 4234, 4234 (amended 2011) (current version at TEX. TAX CODE § 151.006(a)(1)).

[26] TEX. TAX CODE § 151.005(2).

14

re-leasing the property to the federal government. The trial court pointed out that some leased property was transferred to the new contractor after HCSC's contract ended. But there is no finding or even allegation that HCSC's *purpose* in leasing the property in the first place was to re-lease it to the federal government or another contractor. Instead, the transfer of the leased property apparently only happened because the federal contract ended, not because the original purpose of leasing the property was to re-lease it. Thus, HCSC is not due a refund on sales tax paid on the leases.

### D. Documentation of Reimbursements

HCSC is not required to produce documentation proving it did not receive federal government reimbursement for the sales tax it paid. Section 111.104(f) provides:

> No taxes, penalties, or interest may be refunded to a person who has *collected* the taxes from another person unless the person has refunded all the taxes and interest to the person from whom the taxes were *collected.*[27]

The Comptroller argues that this section imposes a burden on HCSC to show it was never reimbursed for the taxes it is seeking to have refunded. The Comptroller claims that HCSC can't prove that here.[28] But the statute precludes a refund only if HCSC *collected* a tax, not just if it was reimbursed some amount that may or may not include a tax. The Comptroller claims that being reimbursed for a tax is equivalent to collecting a tax. That is simply not the case. At all times relevant to this dispute, the Tax Code provided that a person who collects a tax holds that money in

---

[27] *Id.* § 111.104(f) (emphasis added).

[28] In contrast, the trial court seemed to find some circumstantial evidence that the federal government had not reimbursed HCSC for the taxes because HCSC was operating at a loss.

trust for the State.[29]  Such a trust relationship clearly did not exist here; the federal government did not pay HCSC tax for it to hold in trust and then remit to the State.  Further, in the sales tax context, tax is collected by a seller adding the sales tax to an initial sales price and then charging that amount to the buyer as part of the new sales price.[30]  Such a collection process did not occur here.

That is, contrary to the Comptroller's argument, collecting a tax is not the same as reimbursing a tax.  Hypothetically, a contractor and the federal government could agree for the government to pay ten percent of sales tax as part of the consideration for the contract; this would not mean that the contractor would "collect" ten percent of sales tax from the federal government.  Instead, the sale price itself would go up by ten percent of the sales tax rate.  Such a contract might actually be sensible if a federal contractor foresaw having to fight with the Comptroller to get a refund for the tax.  A very similar (although less transparent) contractual arrangement may have occurred here; the federal government may have paid part of the sales tax price as part of the consideration for the contract.

However, if the federal government's contractual arrangement did not intend to pay HCSC for sales tax that was ultimately refunded, the federal government can likely recover the portion of

---

[29] TEX. TAX CODE § 111.016 ("Any person who receives or collects a tax or any money represented to be a tax from another person holds the amount so collected in trust for the benefit of the state and is liable to the state for the full amount collected plus any accrued penalties and interest on the amount collected.").

[30] *Id.* § 151.052(a) ("COLLECTION BY RETAILER. . . . [A] seller who makes a sale subject to the sales tax imposed by this chapter shall add the amount of the tax to the sales price.").

16

the sales tax that it paid.[31]   Therefore, the risk of HCSC receiving an unintended windfall at the federal government's expense is slight.

Regardless, though, as explained above, the statute designed to prevent double recovery (Section 111.104(f)) is inapplicable in light of the fact that HCSC never "collected" tax from the federal government, which is a prerequisite for the statute's application.[32]   Our statutory interpretation is reinforced by the fact that it makes sense from a policy perspective to prevent refund of tax only when it is explicitly collected from (i.e., charged as tax to) the buyer.  After all, when such a tax is charged to a buyer, the buyer's understanding is that the portion of the sale attributed to tax will be paid to the government.  The buyer also knows that any profit the seller makes in the transaction is through the sales price alone.  On the other hand, with a lump sum charge to a customer that does not clearly delineate sales tax, the customer has no such expectation that a certain portion will be remitted to the State.  It would also make very little sense to make federal government contractors write up transaction-by-transaction receipts with line items saying "Tax Collected = 0" for each transaction.  Money is plainly and inarguably fungible, so even if the tax collected is listed as zero, federal contractors could just increase the amount they are paid under the contract to cover any money spent on sales tax.  There is no reason to force contractors to engage in such creative accounting when the statute itself does not dictate that result.

---

[31] *See Hercules Inc. v. United States*, 292 F.3d 1378, 1382–83 (Fed. Cir. 2002) (when federal government contract incorporates certain Federal Acquisition Regulations, any state tax refund must be remitted to the United States in the same proportion that the federal government paid the original tax).

[32] The Legislature *could* impose a record-keeping requirement when a tax is reimbursed rather than collected, but Section 111.104(f) does not do so.

17

## III. Conclusion

We affirm in part and reverse in part, holding that HCSC is entitled to a sales- and use- tax refund for all the transactions except the leases of tangible personal property. We remand to the trial court for further proceedings consistent with this opinion.

_____
Don R. Willett
Justice

**OPINION DELIVERED:** June 7, 2013