# IN THE SUPREME COURT OF TEXAS

════════════

No. 12-0617

════════════


UNION CARBIDE CORPORATION, PETITIONER,

v.

DAISY E. SYNATZSKE AND GRACE ANNETTE WEBB, INDIVIDUALLY
AND AS REPRESENTATIVES AND CO-EXECUTRIXES OF THE ESTATE OF
JOSEPH EMMITE, SR., JOSEPH EMMITE, JR., DOROTHY A. DAY,
VERA J. GIALMALVA AND JAMES R. EMMITE, RESPONDENTS

══════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

══════════════════════════════════════════════

**Argued October 10, 2013**

JUSTICE BOYD, joined by JUSTICE GUZMAN, JUSTICE LEHRMANN, and JUSTICE DEVINE, dissenting.

In deciding this case, the Court rewrites an unambiguous statute to achieve the result the Court believes the Legislature must have intended. Because I would hold that the statute means what it says, I must respectfully dissent.

## I. Statutory Construction

"In lieu of pulmonary function testing demonstrating a specified threshold of impairment," section 90.010(f)'s "safety valve" provisions "require pulmonary function testing to have been performed on the exposed person and the physician making the report to have interpreted that testing." *Ante* at ___ (citing TEX. CIV. PRAC. & REM. CODE § 90.010(f)(1)(B)(ii)). The Court

acknowledges that "[t]he language of section 90.010(f)(1)(B)(ii) does not expressly require that the pulmonary function test show functional impairment or otherwise be relevant to the physician's diagnosis of asbestos-related functional pulmonary impairment." *Ante* at ___. Yet it construes the statute to include those requirements because, in its view, (1) doing so is necessary to avoid "nonsensical, absurd results," *ante* at ___; (2) not doing so "would ignore the Legislature's purpose in enacting Chapter 90," *ante* at ___; and (3) not doing so would "attribute to the Legislature an intent for the statute to contain a random, inconsequential, arbitrary hurdle for claimants to overcome." *Ante* at ___. I disagree on all three points.

First, the Court concludes that the only sensible way to interpret section 90.010(f) is to rewrite it to include the requirements that the claimant's pulmonary function tests show "some impairment" (the "impairment requirement") and be a basis for the physician's diagnosis of impairment (the "basis requirement"). But construing the statute as written, to require a pulmonary function test (the "test requirement") that is interpreted by a physician (the "interpretation requirement"), does not create an absurd result because these latter two requirements are not meaningless. At a minimum, the test requirement would establish that the claimant was at least potentially exposed enough, or sick enough, or concerned enough to have had a pulmonary function test at some point prior to filing a legal claim. And the interpretation requirement would ensure that the claimant's physician is aware of the test and considers its results when reaching a diagnosis, and also ensures that the results do not meet the "specified threshold of impairment" under section 90.003. Together, the two requirements also ensure that the defendants are aware of the test's existence and results.

2

The Court rejects these justifications for the test requirement and the interpretation requirement because "nothing in this record or the legislative findings supports" them, but in doing so the Court confuses our role in applying the absurdity doctrine. When determining whether we should ignore a statute's language because it reaches an absurd result, we consider whether "a rational Legislature *could have* intended" that result. *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 631 (Tex. 2013) (emphasis added). We do not require the parties to *prove* the reasons why the Legislature intended a particular result, and we certainly don't require the Legislature to issue legislative findings to state all of the reasons it imposes a statutory requirement. If we can conceive of a rational purpose for the requirement, we cannot strike down the statute as "absurd." *Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 701 (Tex. 2007) (rejecting absurdity argument because "[t]he Legislature *could have* rationally presumed" a reason for statute's requirements) (emphasis added).

Maybe, as the Court contends, requiring that the claimant was exposed, sick, or concerned enough to have had pulmonary function testing at some time in the past, and ensuring that the claimant's physician and opposing counsel are aware of the test, are not very good reasons to impose the test requirement and the interpretation requirement, and maybe there are better reasons to impose the impairment requirement and the basis requirement, but "not very good" and "not better" are a far cry from the kind of "unreasonable" that allows us to ignore a statute's language. We cannot ignore a statute's unambiguous language unless its meaning is so unreasonable that it "would lead to absurd results." *Combs*, 401 S.W.3d at 629; *see, e.g.*, Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 234 (2012) (explaining that courts can ignore a statute's

3

unambiguous meaning only if that meaning "would result in a disposition that no reasonable person could approve"). But even this "can be a slippery slope," because "[i]t can lead to judicial revision of . . . texts to make them (in the judges' view) *more* reasonable." *Id.* at 237 (emphasis added). From my perspective, that is what the Court is doing with section 90.010(f).

It is not our role to make statutes "more reasonable." That is why "the [absurdity] bar for reworking the words our Legislature passed into law is high, and should be." *Combs*, 401 S.W.3d at 630. It has been said that courts can ignore a statute's unambiguous language only when "the absurdity and injustice of applying the provision to the case would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application." Scalia & Garner, *supra* at 237 (quoting Joseph Story, *Commentaries on the Constitution of the United States* § 427 (1833)). Or, at least, as we have said, "[t]he absurdity safety valve is reserved for truly exceptional cases, and mere oddity does not equal absurdity." *Combs*, 401 S.W.3d at 630. This statute does not present such an exceptional case, and the Court's rewriting of the statute achieves, at best, only a "more reasonable" result.

Second, the Court reads the impairment and basis requirements into the statute because it concludes that, without them, the statute would "at least partially fail[] its intended purpose" to ensure that claimants have "physical, functional impairment." *Ante* at ___. In light of the numerous alternative requirements that section 90.012(f) imposes on those who rely on the statute's safety valve, I do not agree.

We must be very careful when we endeavor to construe statutes based on our perception of the Legislature's "purpose." For one thing, "[w]hat motivates one legislator to vote for a statute is

4

not necessarily what motivates scores of others to enact it." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 216 (1983). As a result, "inquiry into legislative motive is often an unsatisfactory venture." *Id.* The task is made easier when, as here, the enacted legislation expressly states its purpose. Here, as the Court notes, the act expressly states that its purposes are "to protect the right of people with impairing asbestos-related and silica-related injuries to pursue their claims . . . while at the same time preventing scarce judicial and litigant resources from being misdirected by the claims of individuals who . . . have no functional or physical impairment from asbestos-related or silica-related disease." Act of May 16, 2005, 79th Leg., R.S., ch. 97, § 1(n), 2005 Tex. Gen. Laws 169, 170.

But even when armed with knowledge of a statute's purpose, we must still determine the manner in which the statute aims to achieve that purpose. "[N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987). We must look to the statute's text to determine the policy choices that the Legislature made when deciding how to achieve Chapter 90's purpose. What we cannot do is simply assume that the statute requires whatever promotes its stated purpose. "[I]t frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law." *Id.* at 526. Thus, we "are bound, not only by the ultimate purposes [the Legislature] has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n.4 (1994).

5

So we must look to the plain language of section 90.010(f), read within the context of the statute as a whole, and determine the means that it adopts to achieve the statute's purpose. Under section 90.010(d), a claimant may proceed to trial from the multidistrict litigation pretrial court after serving a report from a qualified physician that, among other things, verifies that the claimant has asbestos-related pulmonary impairment as demonstrated by pulmonary function testing showing specified levels of impairment. *See* TEX. CIV. PRAC. & REM. CODE §§ 90.003, 90.010(d)(1). Alternatively, the claimant can proceed to trial under the "safety valve" in section 90.010(f), by serving a physician's report that complies with subsection (f)(1) and obtaining findings from the court that comply with subsection (f)(2). Subsection (f)(1) incorporates many of the requirements of subsections 90.003, but not the requirement of a pulmonary function test showing specified levels of impairment. Subsection (f)(2) limits the availability of the safety valve to cases in which the MDL court finds that the claimant's physician's report is reliable and credible, the criteria set forth in section 90.003 (or 90.004 in a silica case) do not adequately assess the claimant's asbestos-related impairment "due to unique or extraordinary physical or medical characteristics," and the claimant has produced sufficient credible evidence for a factfinder to reasonably find that the claimant is physically impaired as a result of exposure to asbestos (or silica) to a degree comparable to the impairment the claimant would have had if the claimant met the criteria set forth in section 90.003 (or 90.004 in a silica case). *Id.* § 90.010(f)(2).

In short, section 90.010(f) provides a mechanism by which asbestos claimants may proceed to trial in the absence of pulmonary function tests that meet section 90.003's impairment standards. They may do this by producing a reliable and credible physician's report that finds impairment

6

"comparable" to that demonstrated by pulmonary impairment tests that satisfy section 90.003's standards. This can only be satisfied when the claimant's "unique or extraordinary physical or medical characteristics" make it such that his pulmonary impairment test results below section 90.003 standards "do not adequately assess" the claimant's asbestos-related impairment. *See id.* § 90.010(f)(2)(B). Because the pulmonary function tests in these circumstances do not meet the minimum impairment standards identified in section 90.003 for proceeding to trial, it makes little sense to require that the physician's impairment conclusion be based on those tests. Instead, the physician necessarily concludes, in light of other considerations, that "comparable" impairment is present despite the sub-standard pulmonary impairment test results.

We know that these are the means by which the Legislature intended to achieve the statute's stated purposes because the statute's text tells us so. To "assume that whatever furthers the statute's primary objective must [also] be the law," as the Court does in this case, only "frustrates rather than effectuates" the Legislature's intent. *Rodriguez*, 480 U.S. at 526. Even if reading the impairment and basis requirements into the statute would be the best policy choice for furthering the statute's stated purpose, we must "read unambiguous statutes as they are written, not as they make the most policy sense," *Combs*, 401 S.W.3d at 629, because "policy arguments cannot prevail over the words of the statute." *In re Allen*, 366 S.W.3d 696, 708 (Tex. 2012).

Finally, the Court concludes that it must read the impairment and basis requirements into the statute because, otherwise, we would "attribute to the Legislature an intent" to impose the test and interpretation requirements "as a meaningless, arbitrary[,] procedural hurdle." *Ante* at ___. As discussed above, because I can conceive of rational justifications for the latter two tests. I do not

7

agree that they are "meaningless" or "arbitrary," even in the absence of the former two tests. But the Court's statement requires an additional comment about "attributing an intent" to the Legislature.

The truth is, we do not and cannot know *all* that the 79th Texas Legislature intended when it enacted section 90.010(f) in 2005. "Intent is elusive for a natural person, fictive for a collective body." Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 HARV. J. L. & PUB. POL'Y 61, 68 (1994). The actual or imputed intent of the Legislature in enacting section 90.010(f) is unknowable because it is nonexistent. We do not know why the Legislature did not include the impairment and basis requirements. Perhaps someone meant to include them but forgot. Or perhaps no one ever thought about doing so. Or perhaps they were the topic of many extended late-night debates in Capitol offices among various legislators and their staffs, and the key players reached an agreement to omit those requirements in exchange for the necessary votes to pass all the requirements they ultimately enacted. "Legislation is compromise. Compromises have no spirit; they just are." *Id.* Including the impairment and basis requirements certainly might have promoted the act's stated purpose, but omitting the requirements may have been the key to passing any legislation at all. We cannot engage in a method of interpretation that requires us to speculate as to conversations, negotiations, and bargains that may have occurred in the Capitol in 2005. Nor can we engage in a method that permits us to fix or improve the statute or make it "more reasonable." And we certainly cannot engage in a method that allows us to make the statute say what we, or some members of the 79th (or current) Legislature, want it to say. What we can do is read and apply the unambiguous language that the Legislature passed, unless doing so would achieve an absurd result. I conclude that applying the as-written language of this statute does not.

8

## II. Conclusion

"Only truly extraordinary circumstances showing unmistakable legislative intent should divert us from enforcing the statute as written." *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 867 (Tex. 1999). "[W]e must take statutes as we find them and first and primarily seek the Legislature's intent in its language. Courts are not responsible for omissions in legislation, but we are responsible for a true and fair interpretation of the law as it is written." *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 637 (Tex. 2010) (citation omitted).

Section 90.010(f) unambiguously requires a claimant's physician to review and interpret a pulmonary function test, but it does not require that the test demonstrate any level of impairment or serve as the basis for the physician's opinion that the claimant is impaired. Instead, section 90.010(f) provides a safety valve for claimants whose pulmonary function tests are medically unreliable as an indicator of impairment. Because this is not an absurd result, we must enforce the statute as written and cannot write in language to cover what we may perceive as policy gaps. Because the claimants in this case satisfied the express requirements of section 90.010(f)'s safety valve provision, I would affirm the court of appeals' judgment.

_____
Jeffrey S. Boyd
Justice

**OPINION DELIVERED:** July 3, 2014