# IN THE SUPREME COURT OF TEXAS

════════════

No. 12-0804

════════════

GARY WAYNE JASTER, PETITIONER,

v.

COMET II CONSTRUCTION, INC., JOE H. SCHNEIDER,
LAURA H. SCHNEIDER, AND AUSTIN DESIGN GROUP, RESPONDENTS

════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

════════════════════════════════════════════════

JUSTICE WILLETT, joined in part by JUSTICE LEHRMANN, and joined by JUSTICE DEVINE, concurring.

I join the plurality opinion[1] but write separately to underscore the centrality of semantic context in statutory interpretation and the perils of resting on a statute's supposed purpose.

## I. Context Indicates that Third-Party Plaintiffs Need Not Comply with Section 150.002.

I agree with the dissent that some words, taken in isolation, do not yield a platonic form free of ambiguity. However, context sheds light on meaning, and I believe the language of this statute, viewed in context, excludes third-party plaintiffs from the expert-affidavit requirement. Thus, the plurality opinion's analysis of the context does not just support its analysis of isolated words—it forms an essential foundation for understanding those words.

---

[1] JUSTICE LEHRMANN does not join the plurality opinion, but joins the remainder of this concurrence.

Judges must navigate a narrow course "between a sterile literalism which loses sight of the forest for the trees, and a proper scruple against imputing meanings for which the words give no warrant."[2] For that reason, "[l]anguage cannot be interpreted apart from context."[3] Meaning is bound to and bound by context. Words derive substance from the ecosystem of language in which we find them, and we must "consider the entire text, in view of its structure and of the physical and logical relation of its many parts."[4] The meaning of language, plain or not, must be drawn from the surrounding context, particularly everyday words and phrases that are inordinately context-sensitive. Such a contextual reading here demonstrates that "the plaintiff" who files "the complaint" in an "action . . . for damages" refers to the original plaintiff in the suit, and not a third-party plaintiff.

I agree with the plurality opinion's analysis of the word "action" in light of the statute's context and briefly add several other contextual considerations that support the plurality opinion's conclusion that the statute does not require third-party plaintiffs to file expert affidavits.

### A. "Plaintiff" Refers Only to the Original Plaintiff.

If action refers to a civil suit as a whole and not to individual claims, the meaning of "plaintiff" is necessarily circumscribed. The statute says "*the* plaintiff." Use of "the" indicates that the language is trying to pinpoint one particular party in the action or arbitration proceeding. Since "action" must be referring to the suit as a whole, this singular emphasis on a *particular* plaintiff seems to rest most naturally with the plaintiff who initiated the suit. Likewise, the required affidavit

---

[2] *N.Y. Trust Co. v. Comm'r of Internal Revenue*, 68 F.2d 19, 20 (2d Cir. 1933) (L. Hand, J.).

[3] *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 441 (Tex. 2011).

[4] ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 167 (2012).

is to be filed with "*the* complaint." Again, this signals a focus on a particular party at a particular moment in the lawsuit. "*The* complaint" most naturally refers to the initial pleading that puts the "action" or suit into motion. Of course, other plaintiffs may come along through intervention or joinder. But when "the" shows up before both "plaintiff" and "complaint," it indicates the targeting of someone and something specific—the plaintiff and petition that put the suit in motion. This makes sense in light of the role of motions to dismiss—they are designed as sentinels that guard the gate and thus most naturally target the party who first comes knocking. Moreover, the manifest object of the provision is fulfilled after the initial plaintiff meets the requirement. There is no obvious need to require each additional plaintiff who sues the defendant to file a separate affidavit in order for this threshold protection to be provided because the initial affidavit has already provided the desired filtering effect.

## B. A Claim Seeking Contribution and Indemnity Is Not an Action "For Damages."

Additionally, section 150.002 does not apply to third-party plaintiffs seeking indemnity and contribution because the affidavit requirement is limited to actions "for damages." I would read this as damages sought by "the plaintiff" who seeks a direct right to recover against the design professional. Here, Comet does not seek damages—it seeks only contribution and indemnity. When a defendant files a third-party action against a third-party defendant seeking contribution and indemnity, the defendant does not increase the possible scope of damages that the plaintiff will ultimately recover. The only changing dynamic is the proportionate share of the damages to be paid. Thus, a claim for contribution and indemnity is not an action "for damages" because it does not provide an independent basis for any new damages. It only adds another variable in determining how

3

the damages already sought by the original plaintiff will be allocated among co-liable parties. Thus, actions for contribution and indemnity are not actions "for damages."

When the language of section 150.002 is viewed as a whole, the meaning of "plaintiff" becomes clear. "Action" refers to civil proceedings, or the lawsuit as a whole. "The plaintiff" therefore is the original plaintiff. Moreover, a third-party plaintiff seeking only contribution and indemnity does not have a claim "for damages." Thus, a third-party plaintiff need not comply with the expert-affidavit requirement.

## II. Analysis of "Action" and "Plaintiff" in Isolation Does Not Free Them of Ambiguity.

In analyzing "action" and "plaintiff," the plurality opinion relies on dictionaries, other statutory provisions, and caselaw. These are helpful tools but often insufficient. "[T]he choice among meanings must have a footing more solid than a dictionary—which is a museum of words, an historical catalog rather than a means to decode the work of legislatures."[5] Reliance on caselaw definitions faces a similar problem. In both circumstances, the words are not considered in the context of their use in the statute before us. With caselaw, the problem is exacerbated because entirely different circumstances may have animated our former interpretation of a particular word. Evidence of meaning from other statutes is also useful, but this can be tricky, as words in statutes may take on unique or varying shades of meaning depending on the context and the purpose for which they are used. Because these tools for analyzing isolated words have limitations, context becomes essential to clarity.

---

[5] Frank H. Easterbrook, *Text, History, and Structure in Statutory Construction*, 17 HARV. J.L. & PUB. POL'Y 61, 67 (1994).

### III. Jaster's Purposive Approach Does Not Dethrone the Primacy of Text.

Jaster and the court of appeals' dissent rely more heavily than CHIEF JUSTICE HECHT on the statute's alleged purpose. Both advocate use of the absurdity doctrine to effectuate the statute's purpose. That purpose, according to Jaster, is to shelter design professionals from the waste of defending non-meritorious claims. He complains that Comet's reading of the statute would frustrate this purpose because the design professional directly sued by the original plaintiff is protected, while the design professional who is dragged into the lawsuit by a defendant eager to pass along or share liability is not. Parties similarly situated are treated differently, which may seem illogical and unfair. But this result does not rise to the kind of absurdity that would justify deviation from a fair reading of the text in favor of a putative purpose.

Liberal use of the absurdity doctrine too often devolves into purposive interpretation of statutes. And reliance on legislative purpose always tempts but rarely tempers. That temptation reaches its zenith when the upshot of a straightforward reading seems illogical or unjust. But a fair reading may well require an unfair result. When interpreting the Legislature's words, we cannot revise them under the guise of interpreting them. "Making law *work* is a proper goal for judges only at the retail level; substance is in the main for the political branches."[6]

Plus, careful textual commitment can encourage careful drafting. When legislatures come to see courts as editors rather than adjudicators, busy legislators may leave the judiciary to tighten the screws on loose language down the road. Vague legislation is sometimes inadvertent and

---

[6] *Id.* at 64 (emphasis in original).

sometimes intentional, but it is always a recipe for increased litigation and judicial guesswork. By sticking to our limited role, judges do more to improve the quality of the law than they ever could by decamping from text to hunt the snark of unvoiced legislative purpose.

In order to carefully police our limited role, the bar for application of the absurdity doctrine must remain high. Peculiarity or unfairness is not sufficient to trigger the absurdity doctrine. As we held recently—and unanimously—statutory language "can often work peculiar outcomes, including over- or under-inclusiveness . . . . [but] mere oddity does not equal absurdity . . . . The absurdity backdrop requires more than a curious loophole."[7] In general, "if the legal deck is stacked via technical statutory requirements, the Legislature should reshuffle the equities, not us."[8] Here, the failure of the statute to protect design professionals from third-party plaintiff claims while furnishing protection from original plaintiffs may be "quirky," but that is "quite different from proving it was quite impossible that any rational Legislature could have intended it."[9]

Indeed, a rational Legislature could have wanted to exclude third-party plaintiffs because requiring their compliance with section 150.002 creates a "quirky" result of its own. Section 150.002 requires submission of an expert affidavit along with the complaint that sets forth "specifically at least one negligent act, error, or omission claimed to exist and the factual basis for each such claim." It is not clear whether this affidavit must lay out some factual basis for each essential element of a negligence claim, but it must at least lay out the factual basis for the "negligent

---

[7] *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 630 (Tex. 2013).

[8] *Roccaforte v. Jefferson Cnty.*, 341 S.W.3d 919, 928 (Tex. 2011).

[9] *Combs*, 410 S.W.3d at 631.

act, error, or omission." A persuasive affidavit regarding a negligent act will often require evidence of the alleged defect resulting from the design professional's supposed negligence. However, this kind of evidence will often also constitute evidence helpful to establish the original plaintiff's claim against the defendant home-builder before the plaintiff has presented his case-in-chief, moved for summary judgment, or even engaged in full discovery. In other words, application of section 150.002 to a third-party plaintiff will often place the defendant/third-party plaintiff in the unenviable position of either breaking ground for his own burial or foregoing his right to indemnity or contribution. While this may not amount to an absurd result, it certainly awakens our sense of unfairness in the same manner as the supposed absurdity of not holding third-party plaintiffs to the same heightened pleading requirement as original plaintiffs. It is not our place to choose between these anomalous results.

Careful textual analysis here points to a clear result, and the plurality opinion rightly declines to engage in the purposive analysis urged by Jaster. Here, context clearly indicates that the text does not require third-party plaintiffs to file an expert affidavit with the third-party petition.

_____
Don R. Willett
Justice

**OPINION DELIVERED:** July 3, 2014

7