ALLSTATE INSURANCE COMPANY,
Appellant

v.

Glenn HEGAR, Comptroller of Public
Accounts of the State of Texas; and
Ken Paxton, Attorney General of the
State of Texas, Appellees

NO. 03–13–00341–CV

Court of Appeals of Texas,
Austin.

Filed: February 18, 2016

Doug Sigel, Mark W. Eidman, Ryan Law Firm, L.L.P., Austin, for Appellant.

Jack Hohengarten, Assistant Attorney General, Financial and Tax Litigation Division, Austin, for Appellees.

Before Chief Justice Rose and Justice Pemberton

## OPINION

Bob Pemberton, Justice

This is an appeal from a district court judgment in a sales-tax-refund suit. The dispute centers on whether the sales tax can be lawfully imposed on an insurance carrier's purchases of claims-adjustment services from a third-party vendor. Resolution of that issue turns on the applicability of Tax Code Section 151.057(2), which excludes from taxation certain services performed by an employee of a "temporary employment service." Following a bench trial, the district court rendered judgment that the carrier take nothing on its refund claims, and the carrier brought this appeal. While we affirm that judgment as to most of the total amount of sales tax in dispute, we also reverse and render judgment awarding the carrier refunds for sales taxes paid on services provided by the vendor's employees at the carrier's own facilities. In reaching that result, we are guided by recent Texas Supreme Court precedents that emphasize the limitations on governmental power vis-a-vis the rights of the taxpayer.

## BACKGROUND

The claimant, Allstate Insurance Company, appellant here, is a property and auto insurer that operates nationwide, including in Texas. When claims are made under the policies it issues, Allstate, like other insurers, undertakes a process of investigation, negotiation, and ultimate resolution known as "adjustment." With respect to most claims, Allstate relies on its own employees (who are termed "adjusters") to handle this process, but the carrier has also frequently procured the limited-term, project-specific assistance of additional adjusters who are employed by Pilot Catastrophe Services, Inc., most commonly in connection with weather events that generate large volumes of claims. The particulars of Allstate's dealings with Pilot and its adjusters are at the heart of the legal issues in this case and are most usefully discussed as they become relevant to our analysis. For now, we need only note that during the years 2006 through 2009, Allstate paid Pilot over $250 million for services related to Texas claims and that these payments included approximately $18.9 million in Texas state sales taxes on those services.[1] Allstate filed claims with the Comptroller seeking refund of these sales-tax payments, and that was the genesis of the present litigation.

The Texas Legislature has imposed the sales tax generally "on each sale of a taxable item in this state,"[2] and has seen fit to include within "taxable items" certain "taxable services" that include "insurance services," which in turn encompass "insurance claims adjustment or claims processing."[3] Although the parties vigorously dispute the proper identity or characterization of the service or services Pilot sold

1. The parties stipulated that the precise amount of taxes Allstate paid was $18,954,813.74.

2. Tex. Tax Code § 151.051.

3. See id. §§ 151.010 (" '[t]axable item' means tangible personal property and taxable services"), .0101(a)(9) ("taxable services" include "insurance services"), .0039(a) ("insurance service" generally means "insurance loss or damage appraisal, insurance inspection, insurance investigation, insurance actuarial analysis or research, insurance claims adjustment or claims processing, or insurance loss prevention service").

Allstate, as we will discuss shortly, there is no disagreement that the service or services, however defined, would constitute "insurance claims adjustment or claims processing" within the meaning of the Tax Code. In seeking refund, however, Allstate maintained that Pilot's sales of its "claim adjustment or claims processing" were excluded from taxation by Section 151.057, Subsection (2), of the Tax Code, in which the Legislature has specified that certain "service[s] performed by an employee of a temporary employment service" are "not taxable under this chapter." [4]

Concluding that Allstate's dealings with Pilot did not implicate Section 151.057(2), the Comptroller denied the carrier's refund claims in full. After pursuing its remaining administrative remedies without success, Allstate brought a taxpayer suit in Travis County district court.[5] Following trial de novo to the bench,[6] the district court rendered judgment that Allstate take nothing on its refund claims. The court subsequently made findings of fact and conclusions of law elaborating as to its reasoning. Among other contents of note,

the court's findings and conclusions reflected not only its determination that Allstate had failed to meet its burden of proof as to the requirements of Section 151.057(2)'s tax exclusion, but also underlying constructions of that statute on which those conclusions depended.

Allstate then perfected this appeal. It brings two issues, the crux of which is that the district court's judgment is founded on an erroneous construction of the tax exclusion in Section 151.057(2).

## STANDARD OF REVIEW

As Allstate seems to acknowledge, it had the burden of proof in its refund suit [7] and, consequently, can prevail on appeal only if it demonstrates that the evidence below conclusively established that the transactions on which it paid sales taxes were excluded from taxation by Tax Code Section 151.057(2), in which case we would reverse and render judgment awarding it the refunds it sought.[8] Alternatively, Allstate can obtain reversal and remand for a new trial if it demonstrates that the dis-

---

4. *See id.* § 157.057(2).

5. *See generally id.* §§ 112.001–.156 (provisions governing "taxpayer suit" for refund). As required by Chapter 112, Allstate named both the Comptroller and the Attorney General as defendants. *See id.* § 112.151(b). For ease of reference, we will hereafter use "the Comptroller" to identify both of those parties collectively in the absence of any material distinction between the two.

6. *See id.* § 151.054 (trial is de novo).

7. *See id.* §§ 111.104(a), 112.052–.053; *GATX Terminals Corp. v. Rylander*, 78 S.W.3d 630, 634 (Tex.App.–Austin 2002, no pet.) (holding that taxpayer seeking refund had burden of proof at de novo hearing (citing *Key W. Life Ins. Co. v. State Bd. of Ins.*, 163 Tex. 11, 350 S.W.2d 839, 846 (1961) (holding that trial de novo in administrative context requires retrial "as if no trial whatever has been had in the

court below"); *Attorney Gen. v. Orr*, 989 S.W.2d 464, 467 (Tex.App.–Austin 1999, no pet.) (relying on *Key Western Life* to hold that party with burden of proof at first hearing must still carry that burden of proof at de novo hearing))).

8. *See City of Keller v. Wilson*, 168 S.W.3d 802, 815–17 (Tex.2005) (explaining that conclusive evidence is the converse of no evidence and affirmatively establishes a fact as a matter of law); *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001) ("When a party attacks the legal sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue."). "Evidence is conclusive only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case." *City of Keller*, 168 S.W.3d at 816 (footnote omitted).

trict court's failure to so find was against the "great weight and preponderance" of the evidence.[9] But analysis of both issues is necessarily framed by construction of Section 151.057(2)—it is that statute's scope and meaning, after all, that ultimately controls whether or how the existence or nonexistence of particular facts have legal effect upon Allstate's claimed right of recovery.

Statutory construction presents a question of law that we review de novo,[10] and the general principles that guide that exercise are familiar. "[O]ur chief objective is effectuating the Legislature's intent, and ordinarily, the truest manifestation of what lawmakers intended is what they enacted."[11] "This voted-on language is what constitutes the law, and when a statute's words are unambiguous and yield but one interpretation, 'the judge's inquiry is at an end.'"[12] "We give such statutes their plain meaning without resort to rules of construction or extrinsic aids."[13] On the other hand, if a statute is vague or ambiguous, we ordinarily defer to a reasonable construction of it by an agency charged with its enforcement, so long as the con-

struction is not plainly erroneous or inconsistent with the statutory text.[14]

 While construction of tax statutes can be highly technical and laden with policy consequences, it remains fundamental that it is the language chosen by the Legislature that ultimately controls and that neither the Comptroller nor courts may "revis[e] the [Tax Code] in the guise of interpreting it."[15] Yet there are refinements and qualifications to the usual statutory-construction principles that come into play when confronting tax statutes, as the Texas Supreme Court has pointedly emphasized recently. Most critically, where the issue concerns the applicability of a tax exclusion like Section 151.057(2)—i.e., whether a taxpayer is subject to a tax in the first instance, as opposed to whether it is entitled to an exemption from a tax to which it otherwise would be subject—we are to apply "an ancient pro-taxpayer presumption: The reach of an ambiguous tax statute must be construed 'strictly against the taxing authority and liberally for the taxpayer.' In other words, a tax must apply unequivocally."[16] "This presump-

---

**9.** *See Dow Chem. Co.*, 46 S.W.3d at 242 ("When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence."). A fact-finder's failure to find a fact is against the "great weight and preponderance" of the evidence when it is "clearly wrong and unjust." *See id.; see also Pool v. Ford Motor Co.*, 715 S.W.2d 629, 636 (Tex.1986) (stating the standard in terms of the finding being "so against the great weight and preponderance as to be manifestly unjust").

**10.** *See, e.g., State v. Shumake*, 199 S.W.3d 279, 284 (Tex.2006).

**11.** *Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 635 (Tex.2013) (citing *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex.2008)).

**12.** *Id.* (quoting *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651–52 (Tex. 2006)).

**13.** *Id.* (citing *Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635, 637 (Tex.2010) (citing *City of Rockwall v. Hughes*, 246 S.W.3d 621, 626 (Tex.2008))).

**14.** *See id.* (citing *Texas Dep't of Ins. v. American Nat'l Ins. Co.*, 410 S.W.3d 843, 853 (Tex. 2012)).

**15.** *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 627 n. 8 (Tex.2013) (quoting *Roark*, 422 S.W.3d at 637).

**16.** *Tracfone Wireless, Inc. v. Commission on State Emergency Commc'ns*, 397 S.W.3d 173, 182 (Tex.2013); *cf. id.* at 183 (contrasting this rule governing tax *exclusions* with the "contrary presumption favoring the taxing entity"

tion arises from an old English rule that 'the sovereign is bound to express its intention to tax in clear and unambiguous language,' "[17] and is rooted in the policy that "taxpayers should be given notice of their tax obligations before the State imposes them."[18] Elaborating further, the high court has described the doctrine's effect this way:

> Judicial construction of tax statutes eschews fuzzy math. Legislators must speak clearly, agencies heed assiduously, and courts review exactingly. Several cardinal, century-old principles dictate strictness in tax matters: (1) tax authorities cannot collect something that the law has not actually imposed; (2) imprecise statutes must be interpreted "most strongly against the government, and in favor of the citizen"; and (3) we will not extend the reach of an ambiguous tax by implication, nor permit tax collectors to stretch the scope of taxation beyond its clear bounds.[19]

And this presumption, the supreme court has made clear, trumps the general principles that would otherwise counsel deference to an agency's construction of a vague or ambiguous statute.[20]

Additionally, the Texas Supreme Court has cautioned us that construction and application of a tax statute "should not disregard the economic realities underlying the transaction at issue."[21] One recent illustration of this principle's application and effect is the court's recent *Roark* case, in which it addressed whether the purchase of plush toys for use in coin-operated claw games qualified for the sale-for-resale exemption. Resolution of that issue turned on whether the transfer of toys to customers was an "integral part" of the amusement service the game machine provided, with the key question being whether this requirement could be met where it was undisputed that the machines did not transfer a toy to each and every customer who plays, but typically made such transfers only rarely.[22] While a toy transfer would not occur in the vast majority of transactions in which a given customer paid to play, the court reasoned that such transfers were nonetheless an "integral part" of the transaction in a "practical sense" because each toy would ultimately be transferred to some customer (barring destruction or theft) and that it was this *"possibility* of winning a toy" in any given game that induced customers to pay their money to play.[23] Indeed, the court ob-

when a tax *exemption* is claimed (citing *Bullock v. National Bancshares Corp. of Tex.*, 584 S.W.2d 268, 271–72 (Tex.1979))).

17. *Id.* at 182 (citing *Eidman v. Martinez*, 184 U.S. 578, 583, 22 S.Ct. 515, 46 L.Ed. 697 (1902)).

18. *Id.* at 182 (citing *Eidman*, 184 U.S. at 583, 22 S.Ct. 515).

19. *Id.* at 183 (quoting *Gould v. Gould*, 245 U.S. 151, 153, 38 S.Ct. 53, 62 L.Ed. 211 (1917)) (internal footnote omitted).

20. *Id.* at 182–83 ("[A]gency deference does not displace strict construction when the dispute is not over how much tax is due but, more fundamentally, whether the tax applies at all.").

21. *Roark*, 422 S.W.3d at 637 & n.14. For this proposition, the supreme court cited both its own precedent, *Bullock v. Statistical Tabulating Corp.*, 549 S.W.2d 166, 167–68 (Tex.1977) (looking to the "essence of the transaction" or the "true object of the transaction"), and those of the United States Supreme Court, *see, e.g., Boulware v. United States*, 552 U.S. 421, 429, 128 S.Ct. 1168, 170 L.Ed.2d 34 (2008) (looking to "the objective economic realities of a transaction rather than ... the particular form the parties employed").

22. *See Roark*, 422 S.W.3d at 637–38 (referencing Tex. Tax Code § 151.006(3)).

23. *Id.* at 637.

served, if a toy transfer occurred each and every time a customer played the game, "the game would lose all intrigue and thus all profitability," and "[n]o profit-seeking businessperson would rationally offer such a sure thing." [24]

With these principles in mind, we now turn to the statutory-construction issues on which this appeal turns.

## ANALYSIS

Tax Code Section 157.057, titled "Services By Employees," provides in Subsection (2) that the following service "is not taxable under this chapter":

> a service performed by an employee of a temporary employment service as defined by Section 93.001, Labor Code, for an employer to supplement the employer's existing work force on a temporary basis, when the service is normally performed by the employer's own employees, the employer provides all supplies and equipment necessary, and the help is under the direct or general supervision of the employer to whom the help is furnished.[25]

Subsection (2) is a counterpart to Subsection (1) of Section 151.057, which excludes from the sales tax "a service performed by an employee for his employer in the regular course of business, within the scope of the employee's duties, and for which the employee is paid his regular wages or salary." [26]

As it would apply in this case, Subsection (2) can be summarized as having the following five requirements or elements, each of which must be established in order for a given "service" to be excluded from taxation:

- "[A] service [is] performed by an employee of [Pilot] ... for an employer [here, Allstate] to supplement the employer's [Allstate's] existing work force on a temporary basis."
- Pilot must be "an employment service as defined by Section 93.001, Labor Code."
- "[T]he service is normally performed by the employer's [Allstate's] own employees."
- "[T]he help is under the direct or general supervision of the employer [Allstate] to whom the help is furnished."
- "[T]he employer [Allstate] provides all supplies and equipment necessary." [27]

The district court concluded that Allstate had failed to establish any of these requirements—as that court had construed them—by a preponderance of the evidence. Allstate argues that the district court misconstrued each requirement and that, under correct constructions, the evidence conclusively established each.

**"[A] service performed by an employee of [Pilot] ... for [Allstate] to supplement [Allstate's] existing work force on a temporary basis."**

■ This requirement, which we will term the "temporary-supplementation" requirement for ease of further reference, is singularly the most pivotal to Allstate's

24. *Id.* at 637–38.

25. Tex. Tax Code § 151.057(2).

26. *Id.* § 151.057(1). Subsequent to the district court's ruling, the Legislature amended section 157.057 to add a third subsection that explicitly excludes certain services purchased through "professional employer organiza-

tions." *See* Act of May 7, 2013, 83d Leg., R.S., ch. 117, § 22, sec. 151.057, 2013 Tex. Gen. Laws 495, 505 (codified at Tex. Tax Code § 151.057(3)). That recent change is not implicated here.

27. *See* Tex. Tax Code § 151.057(2).

right of recovery and has garnered the greatest briefing attention from the parties on appeal. To meet its burden as to the temporary-supplementation requirement at trial, Allstate presented evidence concerning the structure of its transactions with Pilot and how its use of Pilot-employed adjusters fit into the carrier's broader business model. This evidence included, in addition to documentary evidence, the live testimony of an Allstate representative, Otto Mujica. Mujica explained that at relevant times, Allstate has handled claims made under its property and auto policies through either of two basic sets of processes. For "regular business," which Mujica described as "rank and file kitchen fires, traffic accidents, burglaries, things of that nature," Allstate has relied on an in-house adjuster workforce that has numbered around 8,000 nationwide and is distributed among Allstate's many local Allstate offices based on the number of policies in force in each respective area and actuarial information. But where claims arising from a particular event exceed a threshold of $1 million in aggregate value, Mujica indicated, Allstate has designated the claim-producing event as a "catastrophe" and assigned the claims in the first instance to an Allstate "National Catastrophe Team" that includes approximately 220 Allstate-employed adjusters. Mujica explained that a primary purpose of this differential treatment is to enable Allstate to marshal dedicated adjuster resources in response to large-scale claim-producing weather events (e.g., hurricanes, hailstorms, and windstorms) that can overwhelm local offices and are so unpredictable in location, severity, and complexity that the company could not adequately or cost-effectively prepare for them simply by hiring and deploying larger local staffs.

Pilot's role, Mujica continued, has been primarily to serve in a role that he compared to the "National Guard" supporting the "Army" of Allstate's National Catastrophe Team. In each instance in which Allstate determines that additional adjuster resources are required to respond adequately to a weather event, according to Mujica, the carrier has called upon Pilot to provide it a specified number of Pilot-employed adjusters, as warranted by the event, to work on Allstate's behalf so long as needed "to get [Allstate] through the volume bubble"—with hurricanes, 90 to 120 days at most; with wind and hail events, 30 to 60 days; and often less time than this—"and then they are released." In a relatively small number of instances—what Mujica estimated to be around one percent of the total number of claims on which Pilot assisted Allstate during the periods at issue—Pilot adjusters were also called in by Allstate to work for a similarly limited-term basis on "non-catastrophe" claims, sometimes in relief of regular Allstate employees who were absent due to illness, vacation, maternity leave, and the like. In return for this work, Mujica further indicated, Allstate paid Pilot for the work of whichever adjusters the carrier had actually utilized, typically calculated on a per-claims-handled basis. Mujica added that Allstate regarded this arrangement with Pilot as preferable to hiring additional in-house adjusters in numbers sufficient to respond to a catastrophic weather event if, when, and wherever it might occur, as that alternative would substantially raise Allstate's fixed costs (and, in turn, ultimately the premiums it charges consumers), yet might or might not prove to be justified depending on how the weather turned.

A representative of Pilot, John Hetherly, also testified at trial and provided a materially similar description of the companies' dealings. Both he and Mujica added that their companies had executed a

succession of "umbrella agreements," titled "Independent Adjustment Agreements," the first of which was in effect during the years 1999 through 2006, the second beginning in 2007 and beyond. Under each contract, Pilot agreed to make available to Allstate, within 48 hours of Allstate's request, and on a "priority basis," a specified minimum number of adjusters who were qualified to handle property or auto claims, and to offer Allstate still more adjusters from "unassigned [Pilot] Adjuster resources." Allstate, in turn, agreed that it would not call upon any outside adjustment firm other than Pilot for assistance with "catastrophe" claims until either Pilot's minimum adjuster commitments were exhausted or Pilot otherwise declined the opportunity. The carrier also agreed to utilize Pilot adjusters for "non-catastrophe" claims under more limited circumstances.

In the event Allstate actually called upon Pilot to provide adjusters, the agreements further specified that the Pilot employees would provide "Adjusting Services" defined as follows:

> the inspection of damaged property, analysis of insurance policy for coverage issues, determination of the nature, cause, and extent of property damage, communications with insureds regarding the claim, negotiation and settlement with insureds or their representatives, preparation of required reports and, when authorized, check issuance within the authority granted to Pilot by Allstate, which occurs in connection with handling a claim for benefits under an Allstate Policy in the United States.

In return, the agreements further provided, "Allstate shall pay Pilot the Fees specified in the Fee Schedule attached as Exhibit A for the Adjusting Services performed pursuant to this Agreement." The referenced Exhibit A consisted of a fee schedule that set forth both per-claims-handled charges, quantified as a percentage of the claim's value, and per-adjuster-day charges. This was the sole payment obligation the agreements imposed on Allstate; there was no mention of a retainer, general contract charge, or any other additional payment or charge.

Both Mujica and Pilot's Hetherly indicated that these sorts of "umbrella" agreements are standard practice in the insurance industry, serving to ensure that a carrier has stable and ready access to additional adjusters in the event a major weather event hits.[28] They also emphasized that while the "umbrella" agreements addressed the broader aspects of the companies' business relationship and had been in effect for several years, Allstate's actual purchases of "Adjusting Services" were structured as multiple separate transactions in which the carrier had paid Pilot for the work provided by particular Pilot adjusters, in a particular location, for a particular, limited period of time, with such details varying according to the particular event or need to which the engagement had responded.[29] Allstate additionally emphasized that the 2007 version of the agreement has explicitly defined the "Term of Adjustment Services" Pilot adjusters provided as "the temporary periods with respect to each Catastrophe or non-Catastrophe event," adding that "Allstate shall utilize the services of the independent [Pilot] adjusters with respect

---

**28.** As Mujica put it, "[t]he last thing [Allstate] would want to do is enter into a negotiation with an independent contracting company when there's a Category 5 barreling down the Texas coast."

**29.** Allstate also presented documentary evidence reflecting these numerous transactions.

to each Catastrophe or non-Catastrophe event only until all the claims associated with that event are completed." [30]

This and other evidence, in Allstate's view, established that in each instance in which it had utilized Pilot-employed adjusters during the relevant time periods, it had purchased "a service performed by an employee of [Pilot] ... for [Allstate] to supplement [Allstate's] own workforce on a temporary basis," as Section 151.057(2) required. Each of its engagements of Pilot-employed adjusters, Allstate reasoned, provided a service—adjusting claims, or more precisely, the "Adjusting Services" defined under its umbrella agreements—that supplemented its "existing workforce," namely, its own in-house adjusters, particularly including those who served on its National Catastrophe Team. More critically, the evidence, according to Allstate, established that each such engagement had been "*on a temporary basis*" as required by Section 151.057(2).[31] Pointing to dictionary definitions of the word "temporary," Allstate urged that a "temporary basis" would denote service providers who are engaged for a limited duration, as opposed to one of permanent or indefinite duration.[32] Because each of its engagements of Pilot adjusters was directed at addressing specific events or needs and were correspondingly limited in duration, Allstate concluded, these purchases of "Adjusting Services" were plainly not taxable.

In resisting Allstate's refund claims, the Comptroller did not materially dispute Allstate's factual account of its transactions with Pilot. The Comptroller's opposition, rather, was rooted in a competing construction of the phrase "*a service* performed by an employee of [Pilot]" to which Section 151.057(2) refers.[33] According to the Comptroller, the relevant "service performed by an employee of [Pilot]" under Section 151.057(2) should not be defined in terms of each separate instance in which Allstate had engaged the "service" of a Pilot adjuster at a particular time or location, as Allstate had assumed, but the "service" provided by Pilot and its employees in the sense of the parties' overall course of dealing, viewed "holistically." From this perspective, it became significant to the Comptroller that Allstate and Pilot had contracted since 1999—including during the claim period of 2006 through 2009—that Pilot would make available to Allstate specified minimum numbers of adjusters available to Allstate upon request. Relatedly, the Comptroller emphasized language from the agreements specifying the minimum numbers of adjusters that Pilot was to make available to Allstate upon request—400 under the version of the agreement in effect through 2006, and 1,150 under the subsequent version, with both figures subject to annual adjustment by agreement of the parties. The Comptroller similarly pointed to evidence of the

**30.** To similar effect, the 2007 version also provided explicitly that, "Services performed under this Agreement for both Catastrophe and non-Catastrophe events are special, non-recurrent projects that are temporary in nature."

**31.** *See* Tex. Tax Code § 151.057(2).

**32.** *See The Compact Oxford English Dictionary* 2024 (2d ed. 1994) (defining "temporary" as "[l]asting for a limited time; existing or valid for a time (only); not permanent; tran-

sient made to supply a passing need"); *see also, e.g., The American Heritage Dictionary of the English Language* 1792 (5th ed. 2011) (defining "temporary" as "lasting, used, serving, or enjoyed for a limited time"); *Webster's Third New Int'l Dictionary* 2353 (2002) (defining "temporary" as "lasting for a time only: existing or continuing for a limited time: impermanent, transitory").

**33.** Tex. Tax Code § 151.057(2).

frequency and volume of Allstate's actual use of Pilot adjusters during the relevant time period. During each of the years 2006 through 2009, as Allstate acknowledged, it had utilized between 1,556 and 4,044 total Pilot-employed adjusters nationwide,[34] with substantial amounts of this work being performed in Texas—in 2006, 800 Pilot adjusters performed services related to 31,627 claims arising in Texas; in 2007, 336 Pilot adjusters performed services related to 23,352 Texas claims; in 2008, 1,716 Pilot adjusters performed services related to 27,773 Texas claims; and in 2009, 512 Pilot adjusters performed services related to 68,237 Texas claims. These figures, the Comptroller emphasized, represented a substantial percentage of the total volume of claims handled by Allstate's own in-house adjusters.

On the other hand, the Comptroller acknowledged that Allstate's use of Pilot adjusters had not remained at a constant level in either numbers or geographic distribution, but had fluctuated or "spiked" in a manner corresponding to weather events at particular locations. But more critical for the Comptroller were calculations, presented through the testimony of a representative from his office, to the effect that on any given date throughout the tax years at issue, at least one Pilot employee, and typically more, had been providing "Adjusting Services" to Allstate at some location in Texas. The Comptroller urged that these calculations, together with the aforementioned proof of the substantial overall volume of business that Allstate and Pilot had conducted with one another, established that the "service performed by an employee of [Pilot]" to Allstate had been— at least in the "holistic" sense in which the Comptroller has construed that phrase—

"continuous" and "ongoing," the antithesis of a "temporary basis." That the Pilot employees might have been working at different locations or in connection with different weather events was immaterial, the Comptroller maintained, as he regarded Allstate's "attempt[ ] to slice among events, geographic areas, [or] particular assignments" as "simply a gloss on [S]ection 151.057(2) that is not supported by the statute itself."

The district court was persuaded by the Comptroller's construction of Section 151.057(2) and analyzed the evidence accordingly. To support a conclusion that "Allstate [had] failed to prove by a preponderance of the evidence that the adjusting services it purchased from Pilot were provided on a temporary basis," the court cited findings that Allstate and Pilot had executed two successive contracts "requir[ing] that Pilot guarantee a minimum number of adjusters" and "even more adjusters—in addition to the minimum commitment—on a priority basis" and that Allstate had actually utilized Pilot adjusters in the amounts and frequency previously described. Echoing the Comptroller's view of the relevant "service" provided by Pilot, the court further found that "Pilot adjusters [had] provided claims adjusting services" to Allstate during each month of 2006, 2007, 2008, and 2009; that Allstate had "utilized Pilot adjusters" and "the independent adjusting services provided by Pilot" "throughout the Claim Period"; and that while "the level of adjusting services provided by Pilot fluctuated throughout the Claim Period, the service itself was provided on a continuous basis."

On appeal, as below, the parties' competing positions as to whether Allstate satis-

---

**34.** In 2006, Allstate utilized a total of 4,044 Pilot-employed adjusters nationally; in 2007, 1,556; in 2008, 3,472; and in 2009, 1,817.

fied Section 151.057(2)'s temporary-supplementation requirement derive ultimately from their divergent views of the relevant "service performed by an employee of [Pilot]." While Allstate complains that the Comptroller and district court "incorrectly contrived to artificially string together separate engagements at discrete . locations," the Comptroller insists that "Pilot's engagement should be considered as a whole" and was, accordingly, "continuous" rather than "temporary." We conclude that Allstate's view of the relevant "service" under Section 151.057(2) must control here.

■ Our reasoning begins with the nature of the sales tax to which Section 151.057(2)'s exclusion is addressed.[35] As Allstate observes, the sales tax is, fundamentally, a "tax on the transaction," [36] namely, on "each sale of a taxable item." [37] Here, the parties agree, the taxable item at issue would be a type of taxable service—"insurance claims adjustment or claims processing"—although they differ as to which actions of Pilot this would refer. The Tax Code provides that the "sale" or "purchase" of a taxable service means, as applicable here, "the performance of a taxable service" "when done or performed for consideration." [38] The evidence demonstrates conclusively that the

transactions on which Allstate paid sales tax consisted of Allstate's payment of money to Pilot for "Adjusting Services"—contractually defined in terms of hands-on property inspection, coverage analysis, and claim negotiation and resolution—that had actually been rendered by Pilot adjusters at a particular location, in response to a particular weather event or other need. Each such payment, further, was calculated based on the number of claims the adjusters had handled or the number of days they had worked. Conversely, Allstate had no obligation to pay Pilot, nor ever did so, merely for Pilot's agreement to provide adjusters if and when needed or other obligations under the contracts, standing alone. Rather, no payment obligations arose on the part of Allstate unless and to the extent it actually utilized Pilot adjusters.

As such, the "economic reality" or "essence" of Allstate's transactions with Pilot [39] consisted of Allstate's purchases of "insurance claims adjustment or claims processing" from Pilot in the sense of the actual performance of "Adjusting Services" by Pilot adjusters under the parties' agreements, not simply for the broader aspects of the business relationship that the Comptroller emphasizes. Further, these transactions were structured as mul-

---

**35.** *See In re Office of the Attorney Gen.*, 456 S.W.3d 153, 155 (Tex.2015) ("We construe the words of a statute according to their plain meaning, and in the context of the statute's surrounding provisions.") (citing Tex. Gov't Code § 311.011(a); *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex.2004)); *see also, e.g., State v. $1,760.00 in U.S. Currency*, 406 S.W.3d 177, 180 (Tex. 2013) (noting importance of considering statute within context of statutory scheme); *Texas Worker's Comp. Ins. Fund v. Del Indus., Inc.*, 35 S.W.3d 591, 593 (Tex.2000) (stating that we do not construe statutory language in isolation but in the context of the entire statutory scheme).

**36.** *See Bullock v. Foley Bros. Dry Goods Corp.*, 802 S.W.2d 835, 838 (Tex.App.–Austin 1990, writ denied) ("In Texas, sales and use taxes are transaction taxes." (citing *Calvert v. Canteen Co.*, 371 S.W.2d 556, 558, 561 (Tex.1963) (describing Texas sales tax as "a transaction tax upon the event of a retail sale"))).

**37.** *See Davis v. State*, 904 S.W.2d 946, 952 (Tex.App.–Austin 1995, no writ) (citing Tex. Tax Code § 151.051; *Calvert*, 371 S.W.2d at 558).

**38.** Tex. Tax Code § 151.005(3).

**39.** *See Roark*, 422 S.W.3d at 637 & n. 14.

tiple discrete purchases of "Adjusting Services" rendered by particular adjusters at particular locations and particular times. It is this notion of "insurance claims adjustment or claims processing" that must, in turn, inform construction and application of the phrase "a service performed by an employee of [Pilot]" when applying the temporary-supplementation requirement here. Consistent with Allstate's position, "a service performed by an employee of [Pilot]" necessarily refers here to each discrete instance in which Pilot adjusters actually performed "Adjusting Services" for Allstate, not to "service" in the "holistic" sense the Comptroller advocates.

This construction of "a service performed by an employee of [Pilot]" is also more consistent with the actual text of that phrase—"a service performed by *an employee* of [Pilot]." While the use of "an employee" in the singular as opposed to plural is not necessarily dispositive in itself,[40] this phrasing, as Allstate observes, suggests an analysis that is focused on the workforce supplementation provided by the Pilot employee or employees who provide services on a particular occasion, as opposed to one focused on the aggregate or overall "service" provided by Pilot and its entire work force. While seemingly acknowledging this tension, the Comptroller urges that this statutory feature ultimately favors his position. He reasons that "a service provided by *an employee* of [Pilot]" implies "a one-for-one substitu-

tion—a temporary employee substituted here and there—on an isolated basis." "The Legislature's use of the singular," the Comptroller continues, belies intent that Section 151.057(2) encompass Allstate's use of "[t]housands upon thousands of Pilot adjusters" and what he labels as Allstate's "intentional understaffing." Leaving aside that singular-versus-plural references are not necessarily controlling,[41] the Comptroller's concerns are quickly dispelled by observing that nothing in the phrase "a service performed by an employee of [Pilot]," nor any other component of Section 151.057(2), forecloses the exclusion's application where more than one "employee of [Pilot]," or even many, have performed "a service"—one would simply analyze separately each instance of "a service performed by an employee" or employees of Pilot. These observations only lend further support to Allstate's engagement-by-engagement analysis of the "service" Pilot provided. To the extent the Comptroller asserts that Section 151.057(2) must be read more restrictively so to combat "understaffing" or recurrent temporary supplementation by employers, he has engrafted additional requirements and limitations onto the statute in the guise of interpreting it.[42] Indeed, the existence of some level of "understaffing" on the part of the employer is implicit in the "supplement[ation of] the employer's existing workforce" that Section 151.057(2) contemplates.[43]

---

40. *See* Tex, Gov't Code § 311.012(b) (Code Construction Act provision instructing that, "The singular include the plural and the plural includes the singular.").

41. *See id.*

42. *See Health Care Servs. Corp.*, 401 S.W.3d at 627 n. 8 (noting that "if the statute does 'not impose, either explicitly or implicitly,' the 'extra-statutory requirement' urged by the Comptroller, 'we decline to engraft one—re-

vising the statute under the guise of interpreting it'." (quoting *Roark*, 422 S.W.3d at 637)).

43. Similarly, to the extent Section 93.001(2) of the Labor Code informs analysis of the nature of the relevant "service" for purposes of the temporary-supplementation requirement, we note (as we will elaborate in the next section) that the exemplars of "special work situations" listed in Subsections (A) through (D) contemplate recurrent and even predictable workforce shortages. *See, e.g.,*

In light of these considerations, we conclude that Section 151.057(2) unambiguously refers to "a service provided by an employee of [Pilot]" in the sense of each performance of "Adjusting Services" by particular Pilot employees, at particular locations, and at particular times, not the "holistic" notion of "service" that the Comptroller urges. But we need not even go that far. In the very least, the foregoing analysis demonstrates that Allstate's construction of "service" is among the reasonable constructions of that term if it is ambiguous, triggering the "ancient pro-taxpayer presumption" requiring us to construe the statute liberally in Allstate's favor and strictly against the Comptroller.[44] In either case, we apply the remaining components of Section 151.057(2)'s temporary-supplementation requirement separately to each of Allstate's engagements of Pilot adjusters.

That remaining analysis is relatively straightforward. The evidence demonstrates conclusively that each instance in which Allstate purchased the "Adjusting Services" performed by Pilot employees was to "supplement [Allstate's] existing work force"—i.e., add personnel to the 8,000–or–so adjusters the carrier already employed.[45] Each supplementation was likewise "on a temporary basis." A "temporary" basis, as previously noted, ordinarily refers to a limited duration,[46] and in

the context of Subsection (2) would also be a term of contrast or distinction with the "regular" employees whose services to an employer are the focus of Subsection (1).[47] The evidence was conclusive that in each instance in which Allstate engaged the "service" (so defined) of Pilot adjusters, it did so for only a limited period of time, typically no more than 30 to 60 days, and often far less, before releasing the adjusters. Consequently, Allstate met Section 151.057(2)'s temporary-supplementation requirement as a matter of law.

**Pilot is "an employment service as defined by Section 93.001, Labor Code."**

██ Section 151.057(2) next requires that Pilot be "an employment service as defined by Section 93.001, Labor Code." Section 93.001 of the Labor Code, in turn, defines a "temporary employment service" as:

> a person who employs individuals for the purpose of assigning those individuals to the clients of the service to support or supplement the client's workforce in a special work situation, including:
>
> (A) an employee absence;
>
> (B) a temporary skill shortage;
>
> (C) a seasonal workload; or
>
> (D) a special assignment or project.[48]

In holding that Allstate had failed to meet its burden of proof as to this requirement,

---

Tex. Lab. Code § 93.001(2)(C) (referencing "a seasonal workload").

**44.** *See Tracfone Wireless,* 397 S.W.3d at 182–83.

**45.** *See Compact OED* at 1968 (defining "supplement" as "to supply the deficiency in," "to supply (a deficiency)"); *see also, e.g., American Heritage Dictionary* at 1751 (defining noun "supplement" as "something added to complete a thing, make up for a deficiency, or extend or strengthen the whole" and the verb form as "to provide or form a supplement to"); *Webster's* at 2297 (defining "supple-

ment" as "to fill up or supply by additions: add something to: fill the deficiencies of").

**46.** *See Webster's* at 2353 (defining "temporary" as "lasting for a time only: existing or continuing for a limited time: impermanent, transitory"); *see also American Heritage Dictionary* at 1792 (defining "temporary" as "[l]asting, used, serving, or enjoyed for a limited time").

**47.** *Cf.* Tex. Tax Code § 151.057(1).

**48.** Tex. Lab. Code § 93.001(2).

the district court relied on the same fact findings as with the temporary-supplementation requirement, emphasizing the volume and duration of Allstate's aggregated dealings with Pilot and the "continuous" nature of Pilot's "service" as the court had construed that term. Echoing arguments made by the Comptroller, the crux of the court's reasoning was that just as Pilot's "service" (so defined) was not "temporary" but "continuous," Pilot likewise "does not assign its adjusters to support or supplement Allstate's workforce in a 'special work situation' as that term is used in Labor Code section 93.001(2)." The court also specifically addressed each of the exemplar "special work situations" listed in Subsections (A) through (D) of Section 93.001(2), concluding that "Pilot does not assign its adjusters to support or supplement Allstate's workforce in a 'special work situation' occasioned by 'an employee absence' as that term is used in Labor Code section 93.001(2)(A)," nor one occasioned by "a temporary skill shortage," "a special assignment or project," or "a seasonal workload." In regard to "a seasonal workload," the following finding by the court was particularly significant and reflective of its overall reliance on the Comptroller's "holistic" approach:

> Weather events such as hurricanes may be characterized as seasonal. But the totality of weather events and activities [designated by Allstate as a "catastrophe"]—occurring anywhere in the United States that Allstate insured property and vehicles—did not result in a seasonal workload for Pilot.

Allstate urges that the district court's adverse findings and conclusions regarding Section 93.001(2) are founded on an erroneous construction of "a special work situation" and of each of the exemplars listed in Subsections (A) through (D). We agree, for several reasons.

First, for substantially the same reasons we identified in regard to the relevant "service" under Section 151.057(2), Section 93.001(2)'s "purpose of assigning [employees] to the clients of the service to support or supplement the client's workforce in a special work situation," at least as incorporated into Section 151.057(2), must necessarily be construed and applied with reference to the transactions that would otherwise give rise to the client's sales-tax liability—in this case, each of Allstate's engagements of particular Pilot adjusters to perform "Adjusting Services" at particular locations and particular times, considered separately rather than "holistically." Viewed from that perspective, the evidence establishes conclusively that in each instance in which Pilot assigned its employees to work for Allstate, it did so to support or supplement Allstate's work force in either of at least two of the exemplar "special work situations": (1) "an employee absence," or, in the vast majority of cases, (2) workloads generated by weather events that, as the district court found and the Comptroller does not dispute, would each be "seasonal" in nature.[49]

Additionally, even if the circumstances of Allstate's use of Pilot adjusters did not fall squarely within any of the four "special work situations" identified in Subsections (A) through (D) of Section 93.001(2), this would not be singularly fatal to Allstate's right of recovery. As Allstate points out, Subsections (A) through (D) are presented as non-exclusive examples of circumstances that would qualify as "special work situations" under Section 93.001(2), as signified by the Legislature's placement of

---

49. By this, we do not necessarily rule out the applicability of the other exemplars, but need not reach that question.

"including" immediately prior to the list.[50] The import of (A) through (D) is thus not to enumerate exhaustively all conceivable "special work situations," but merely to illustrate the nature or character of such situations. For example, we can discern from the reference to "a seasonal workload" in Subsection (C) that a "special work situation" may encompass at least some recurrent and even somewhat predictable spikes in workload, such as might occur at a water park or beachfront hotel during the warmer months, or in the restaurants and motels of the Texas Hill Country each deer season. The example also shows that "special work situations" may often be weather or climate driven, with corresponding variances by location. Virtually all of Allstate's use of Pilot adjusters, again, was prompted by weather events [51] and shared these same characteristics.

Relatedly, the ordinary meaning of "special," when used in the adjectival form that modifies "work situation" in Section 93.001(2), refers to that which is "distinguished by some unusual quality: uncommon, noteworthy, extraordinary," "supplemental to the regular," "assigned or provided to meet a particular need not covered under established procedure," or "confined to a definite field of action: designed or selected for a particular purpose, occasion, or other end: limited in range." [52] Viewed as we must from the perspective of each discrete engagement of Pilot adjusters by Allstate, the evidence establishes conclusively that each such use occurred in a work situation that was beyond the norm for Allstate or at least entailed "a particular purpose or occasion"—weather events giving rise to over $1 million in claims, which Allstate escalated to its National Catastrophe Team and then to Pilot, or employee absences.

And even if these considerations fall short of demonstrating that Section 93.001(2) unambiguously supports Allstate's underlying construction, we would conclude, as with the temporary-supplementation requirement, that Allstate's construction is at least among the reasonable constructions to which the statute is susceptible. Thus, as Section 93.001(2) is incorporated into Section 151.057(2)'s tax exclusion, we would construe it liberally in Allstate's favor and strictly against the Comptroller.[53] Under that view of the statute, Allstate conclusively established Section 151.057(2)'s requirement that Pilot be "an employment service as defined by Section 93.001, Labor Code."

**"[T]he service is normally performed by [Allstate's] own employees."**

■ Our analysis of the preceding two requirements of Section 151.057(2) also

---

**50.** *See id.; see also* Tex. Gov't Code § 311.005(13) (Code Construction Act provision instructing that, " 'Includes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded.").

**51.** The remaining uses, again, involved filling in for employee absences, falling squarely within Subsection (A).

**52.** *Webster's* at 2186; *see Compact OED* at 1844 (defining "special" as "of such a kind as to exceed or excel in some way that which is usual or common," "additional to the usual or ordinary," "having an individual, particular, or limited application, object, or intention," or "affecting or concerning a single person, thing, circumstance, etc., or a particular class of these"); *American Heritage Dictionary* at 1681 (defining "special" as "surpassing what is common or usual; exceptional," "distinct among others of a kind," "having a limited or specific function, application, or scope," "arranged for a particular occasion or purpose," and "additional, extra").

**53.** *See Tracfone Wireless*, 397 S.W.3d at 182–83.

effectively resolves the third requirement in Allstate's favor. Having determined that the relevant "service" is the "Adjusting Services" performed by the particular Pilot adjusters Allstate engaged on each occasion, that each engagement of this "service" was "to supplement [Allstate's] existing work force on a temporary basis," and that each circumstance in which Pilot provided supplementation would qualify as a "special work situation," it would likewise be true that said service "is normally performed by [Allstate's] own employees," namely, its own in-house adjusters. At a minimum, Allstate's construction would represent a reasonable construction of an ambiguous statute and, therefore, would control. Indeed, we do not understand the Comptroller to independently contest this requirement.

**"[T]he help is under the direct or general supervision of the employer."**

As with the preceding requirements of Section 151.057(2), the parties have advanced divergent positions regarding whether "the [Pilot adjusters'] help [was] under the direct or general supervision of the employer" that derive from competing views as to what that requirement means.

In urging that Allstate failed to meet its burden, the Comptroller has reasoned that *"under the direct or general supervision* of the employer," which the parties agree would refer to Allstate as the "employer," means that the Pilot adjusters must have had the status of "temporary employees" of Allstate. Employee status, the Comptroller next observes, would be mutually exclusive of independent-contractor status.[54] From that premise, the Comptroller deduces that the effect of Section

151.057(2)'s supervision requirement is to make the exemption unavailable to Allstate if it turns out that the Pilot adjusters it utilized had the status of independent contractors rather than employees. And, as the Comptroller emphasizes, the contracts between Allstate and Pilot structured their relationship in precisely that way.

Within Article 2 of the agreements, titled "Personnel and Staffing," Pilot and Allstate agreed that:

> Pilot shall be an "independent contractor" hereunder. Neither Pilot nor any of its employees or other agents shall be deemed an "employee," "agent," "servant," or "joint employee" of Allstate. Allstate will have no control or influence over any of Pilot's employees or other agents. In that regard, Pilot shall have the sole discretion to hire and fire, discipline, evaluate, manage, train, maintain records of hours, handle payroll, provide insurance, and determine all other terms and conditions of employment for its employees.

Other provisions of Article 2 similarly specified that Allstate would have no exposure in regard to the legal status of Pilot employees or their workplace injuries, nor would the Pilot employees be eligible to participate in the benefit programs Allstate provided for its own employees. Furthermore, in Article 24 of the agreements, titled "Independent Contractor," Allstate and Pilot in part reiterated that "the Adjusters are not employees of Allstate."

These contractual provisions, the Comptroller has insisted, "affirmatively disqualify" Allstate from satisfying Section 151.057(2)'s supervision requirement. The district court relied on the same reasoning,

---

54. *See, e.g., Ideal Lease Servs., Inc. v. Amoco Prod. Co.,* 662 S.W.2d 951, 952 (Tex.1983) (observing that employee and independent- contractor capacities "are mutually exclusive").

deeming it singularly fatal to Allstate that the Pilot adjusters had the status of independent contractors. Allstate urges that this reasoning rests upon a fundamental misconstruction of the supervision requirement.

Allstate begins by reminding us of the axiom that the supervision requirement must be read in the context of Section 151.057(2) as a whole.[55] Upon doing so, Allstate maintains, the fallacy of the Comptroller's argument becomes evident:

> a service performed *by an employee of a temporary employment service* as defined by Section 93.001, Labor Code, for an employer to supplement the employer's existing work force on a temporary basis, when the service is normally performed by the employer's own employees, the employer provides all supplies and equipment necessary, and *the help is under the direct or general supervision of the employer to whom the help is furnished.*[56]

As Allstate emphasizes, "the help" that is the subject of Section 151.057(2)'s supervision requirement refers to the same service provider who is referenced in the provision's first clause: "an employee of a temporary employment service." Consequently, Allstate reasons, the supervision requirement, like the other components of Section 151.057(2), contemplates that the service provider will be and remain an employee of the temporary employment service. This regime, Allstate urges, does not preclude it from structuring its rela-

tionship with Pilot to ensure that Pilot's adjusters remain independent contractors rather than employees—in fact, Allstate adds, it seems to contemplate precisely that relationship. In this regard, Allstate also points to evidence to the effect that in the temporary-staffing services industry, to which Section 151.057(2) is addressed, such firms universally rely on an independent-contractor structure so as to limit the exposure and human-resources burdens of client employers, and that it would make little economic sense for employers to patronize such firms otherwise.[57]

We agree with Allstate; in insisting that Section 151.057(2) precludes an independent-contractor relationship, the Comptroller has effectively rewritten Section 151.057(2)'s text in the guise of interpreting it.[58] Alternatively, we would conclude that Allstate's construction is at least one of the reasonable constructions to which the supervision requirement is susceptible, triggering the pro-taxpayer presumption in favor of Allstate.[59] Either way, the independent-contractor status of the Pilot adjusters is not singularly fatal to Allstate's claims.

As for what Section 151.057(2)'s supervision requirement does mean, Allstate points out two additional significant features of the statutory text. First, Allstate notes that the requirement is stated in the disjunctive—"the help is under the direct *or* general supervision of the employer to whom the help is furnished." Among oth-

**55.** *See, e.g., In re Office of the Attorney Gen.,* 456 S.W.3d at 155 ("We construe the words of a statute according to their plain meaning, and in the context of the statute's surrounding provisions.").

**56.** Tex. Tax Code § 151.057(2) (emphases added).

**57.** *Cf. Roark,* 422 S.W.3d at 637 & n. 14 ("We believe that in the area of tax law, like other

areas of economic regulation, a plain-meaning determination should not disregard the economic realities underlying the transactions in issue.").

**58.** *See id.* at 637.

**59.** *See Tracfone Wireless,* 397 S.W.3d at 182–83.

er implications, this usage, as Allstate points out, implies that its required "supervision" of Pilot's adjusters may take the form either of "direct" supervision or "indirect" supervision that is nonetheless "general." The noun "supervision" denotes the oversight and direction of how something is done.[60] The adjective "direct" would denote "having no intervening persons, conditions, or agencies."[61] Thus, when the Legislature has used the phrase "direct supervision" and also defined it, it has often required or contemplated the physical presence of a supervisor with accompanying direction and instruction to a person or activity being supervised.[62] "General" supervision, by contrast, would denote "concerned with, applicable to, or affecting the whole or every member of a class or category."[63] It would thus refer to a manner of supervision that not only may lack the direct component, but also one tending to focus more on the "big picture" as opposed to details.[64] Similarly, when the Legislature has defined "general supervision" in relation to "direct supervision" it has not required the responsible person to be physically present, but sometimes only be available for consultation.[65]

60. *See Compact OED* at 1967 (defining "supervise" as "to oversee, have the oversight of, superintend the execution or performance of (a thing), the movements or work of (a person)"); *see also, e.g., American Heritage Dictionary* at 1750 (defining "supervise" as "to manage and direct; be in charge of"); *Webster's* at 2296 (defining "supervise" as "to coordinate, direct, and inspect continuously and at first hand the accomplishment of: oversee with the powers of direction and decision the implementation of one's own or another's intentions: superintend").

61. *American Heritage Dictionary* at 511; *see, e.g., Compact OED* at 438 (defining "direct" as "effecting or existing without intermediation or intervening agency; immediate"); *Webster's* at 640 (defining "direct" as "active, personal, and responsible; specific: not deputed or to be deputed," "marked by an absence of intending agency, instrumentality, or influence: immediate").

62. *See, e.g.,* Tex. Health & Safety Code § 552.0011(4) ("'Direct supervision' means supervision of the employee by the employee's supervisor with the supervisor physically present and providing the employee with direction and assistance while the employee performs his or her duties."); Tex. Occ. Code §§ 206.001(3) ("'Direct supervision' means supervision by a delegating physician who is physically present and who personally directs delegated acts and remains immediately available to personally respond to any emergency until the patient is released from the operating room or care and has been transferred, as determined by medical board rule, to another physician."), 265.002(a)(2) (A "dental assistant is under the direct supervision, direction, and responsibility of a dentist if the dentist ... is physically present in the dental office when the dental assistant performs a delegated dental act."), 801.002(3) ("'Direct supervision' means supervision of a person by a responsible veterinarian who is physically present on the premises.").

63. *American Heritage Dictionary* at 731; *see Compact OED* at 663 (defining "general" as "comprising, dealing with, or directed to the main elements, features, purposes, etc., with neglect of unimportant details or exceptions; not entering into details; indefinite, vague, opposite of precise"); *Webster's* at 944 (defining "general" as "marked by broad overall character without being limited, modified, or checked by narrow, precise considerations: concerned with main elements, major matters rather than limited details, or universals rather than particulars").

64. *See Blankenship v. Royal Indem. Co.,* 128 Tex. 26, 95 S.W.2d 366, 368 (1936) (noting that "general supervision" was simply to make sure that work was done according to contract or that general results were accomplished as contemplated).

65. *See* Tex. Occ. Code §§ 801.002(4) ("'General supervision' means supervision of a person by a responsible veterinarian who is readily available to communicate with the person."), 265.002(c)(2) (A "dental assistant is under the general supervision, direction, and responsibility of a dentist if the dentist ... is responsible for supervising the services to be performed by the dental assistant.").

Finally, at least one Texas court has construed "general supervision" to denote merely ensuring that work was performed in accordance with a contract or that general results were achieved·as contemplated.[66]

Allstate's second observation is that Section 151.057(2) does not specify that Allstate's "direct" or "general" supervision over the work of Pilot's adjusters must necessarily be the *sole* supervision of either sort that is exercised over them. For this reason, as Allstate emphasizes, it is not singularly fatal that Pilot maintained "sole discretion to hire and fire ... and determine all other terms and conditions of employment for its employees," exercised sole "control and influence" over that relationship, or performed some managerial or supervisory functions in connection with the "Adjusting Services" they performed. Instead, what ultimately matters under Section 151.057(2) is whether Allstate, either singularly or jointly with Pilot, either "directly" or "generally" supervised "the help" the adjusters provided.

Allstate urges, and we agree, that the evidence established conclusively that it satisfied this standard, especially as we would construe it in light of the pro-taxpayer presumption. This evidence includes provisions of the Allstate–Pilot agreements that govern those entities' respective powers and duties specifically in regard to the performance of "Adjusting Services." Among these are:

- "The Parties acknowledge that, although Pilot may afford supervision and guidance to the Adjuster(s) in providing Adjusting Services, Allstate shall, at all times, remain in charge by providing both direct and general supervision of the adjusting of Allstate claims adjusted, by Pilot;

provided, however, Pilot remains responsible for performance in accordance with the terms of this Agreement and Allstate's directions and instructions."

- "Allstate shall provide the necessary supervision, support and supplies to dispatch assignments and process paperwork associated with the handling of individual claims."

- Allstate was expressly permitted to "conduct reinspections to verify that Allstate's adjusting goals are being met," with a goal of reinspecting 5% of the claims from each catastrophe event.

- "Pilot adjusters shall be knowledgeable with regard to Allstate policies and procedures. Allstate shall aid Pilot and cooperate in instructing all adjusters regarding the policies and procedures of Allstate. All adjusting services shall be performed in accordance with [ ] Allstate's policies, procedures and manuals [as are] provided to Pilot by Allstate. Adjusters must have demonstrated a high level of estimating ability, as demonstrated by reinspections performed by Pilot and/or Allstate. Adjusters must have demonstrated commitment to customer service."

- "In the event that Allstate is or becomes dissatisfied with any Pilot Adjuster(s), Allstate shall notify Pilot of the identity of the Adjuster(s) and the nature of Allstate's dissatisfaction and such notice shall occur promptly, and in all events within (5) business days."

- The parties further agreed that Allstate would maintain a database in which Pilot adjusters would be rated in accordance with a formula that

**66.** *See Blankenship,* 95 S.W.2d at 368.

took account of customer-satisfaction surveys, review of the claim file, and reinspections. Pilot's assignment of adjusters with low ratings or who were not yet rated required Allstate approval.

- "Pilot shall participate in quarterly meetings with Allstate to discuss performance. For any area ... in which Allstate is not satisfied with the performance of Pilot or its Adjusters, written action plans to improve performance will be agreed to at the quarterly meetings."

Allstate also presented evidence to the effect that its actual dealings with Pilot were in accordance with these provisions, if not reflecting an even more robust exercise of Allstate's authority in regard to individual Pilot adjusters—for example, there was evidence that in practice, Pilot would remove any adjuster from an assignment immediately upon the carrier's request. Aside from his reliance on provisions of the agreements relating to the independent-contractor structure of the relationship, the Comptroller did not attempt to controvert these facts. We conclude that Allstate conclusively established Section 151.057(2)'s supervision requirement.

## "[Allstate] provides all supplies and equipment necessary."

■ The parties' competing contentions regarding Section 151.057(2)'s fifth and final requirement—that Allstate "provides all supplies and equipment necessary" [67]—distill down to a debate over the proper construction of the modifier "necessary" and whether certain technological assets Pilot adjusters utilized at Allstate's behest were "necessary" in the sense the statute contemplated. As Allstate acknowledges, its agreements with Pilot contained requirements that "[a]ll adjusters will have electronic voice mail, cellular telephones and laptop computers at the time they arrive at a site to provide Adjusting Services to Allstate"; that "Pilot adjusters will use automated estimating systems, as specified by Allstate, to produce auto and property estimates"; and that "Allstate may require Pilot adjusters to meet certain minimum requirements for the hardware, software, operating system, internet communications ... in order to securely access Allstate claims systems." The agreements also required more generally that Allstate and Pilot "shall work together to maintain a seamless technology interface and to develop uniform and economical methods of claims handling and information management." It is undisputed that Allstate did not directly supply Pilot or its adjusters with the cellular phones, laptops, and other assets called for under these provisions, with one exception—in some instances, Pilot adjusters had been stationed within Allstate facilities, as opposed to being assigned to work out in the field or at Pilot facilities. Due to security concerns, these "inside" adjusters had used only equipment provided by Allstate.

The district court concluded that "Allstate [had] failed to prove by a preponderance of the evidence that it provided the Pilot adjusters with all necessary supplies and equipment" based upon two alternative theories hinging on a construction of "necessary." First, the court found that "[u]se of laptops by Pilot adjusters was necessary because the automated estimating systems were an industry standard for insurance companies such as Allstate." In other words, the laptops were "necessary" to the work of Pilot adjusters in the same sense that computer-assisted legal research and word processing can be said to

**67.** Tex. Tax Code § 151.057(2).

be "necessary" to the work of a modern-day appellate court, something that if absent would cause extreme difficulty in accomplishing the task from the contemporary perspective of those who perform it, but not necessarily rising to the level of creating an absolute impossibility. But the court placed heavier reliance on findings to the effect that the use of pagers, electronic voicemail, and laptops by "Pilot outside adjusters" had been "necessary" in light of Pilot's contractual duties—i.e., "necessary" in the sense of being required by legal duty when Pilot adjusters did their work for Allstate.

Allstate urges that both constructions of "necessary" are wrong. Emphasizing dictionary definitions, Allstate insists that the ordinary (and controlling) meaning of "necessary" is the absolute-impossibility sense, something that is essential or otherwise cannot be done without, as opposed to something that is merely "convenient." [68] In the same vein, Allstate points to testimony of its witnesses to the effect that, while perhaps difficult or cumbersome, it is conceivably possible to adjust insurance claims without the modern conveniences of cell phones, laptop computers, automated systems, and the like. Indeed, Allstate observed, this had been the industry reality until comparatively recent times and that even today, adjusters occasionally must resort to those more antiquated methods when weather events disrupt contemporary electronic-communications infrastructure.

Were we examining whether the technology at issue is "equipment necessary" to the work of insurance adjusters generally, we might well conclude that Allstate has conclusively satisfied this requirement of Section 151.057(2). As Allstate observes, "necessary" is reasonably construed—indeed, is typically used—to denote something that is essential rather than merely convenient or desirable, a true need rather than a mere practicality or want [69]—and would, at a minimum, be construed in this manner in light of the pro-taxpayer presumption. In turn, Allstate presented undisputed evidence that insurance adjusters can (and sometimes do) function without cell phones, laptops, and the like, negating that this equipment is "necessary" in the sense that would control our construction of the statute. However, Allstate's analysis ultimately answers the wrong question here.

The real question becomes apparent when reading the "all supplies and equipment necessary" requirement in the context of Section 151.057(2) as a whole:

> a service performed by an employee of a temporary employment service as defined by Section 93.001, Labor Code, for an employer to supplement the employer's existing work force on a temporary basis, when the service is normally performed by the employer's own employees, *the employer provides all supplies*

---

**68.** *See Compact OED* at 329 (defining "convenient" as "personally suitable or well-adapted to one's easy action or performance of actions; favorable to one's comfort, easy condition, or the saving of trouble; commodious"), 1153 (defining "necessary" as "indispensable, requisite essential, needful; that cannot be done without"); *see also, e.g., American Heritage Dictionary* at 400–01 (defining "convenient" as "suited or favorable to one's comfort, purpose, needs"), 1177 (defining "necessary" as "needed or required," "indispensable"); *Webster's* at 497 (defining "convenient" as "suited to personal ease or comfort or to easy performance of some act or function"), 1510 (defining "necessary" as "items (as of … equipment …) that cannot be done without: things that must be had …: essentials," "whatever is essential for some purpose").

**69.** *See supra* n.68 (defining "convenient" and "necessary").

*and equipment necessary,* and the help is under the direct or general supervision of the employer to whom the help is furnished.[70]

As is plain from a reading of Section 151.057(2) in its entirety, the requirement that "the employer provides all supplies and equipment necessary" refers and operates with reference to the "service performed by an employee of a temporary employment service," which is also "the help" referenced in the supervision requirement that follows. In other words, what the "supplies and equipment" must be "necessary" to do in this case is provide the "service performed by an employee of [Pilot]." The relevant "service performed by an employee of [Pilot]" here was the "Adjusting Services" provided by Pilot adjusters under Pilot's agreements with Allstate. Consequently, in applying the "all supplies and equipment necessary" requirement here, we would ask not simply whether the technologies at issue were essential or indispensable to the work of insurance adjusters generally or generically, but whether it was essential or indispensable to the Pilot adjuster's provision of "Adjusting Services" under the agreements.

█ While this conclusion is the analytical linchpin of our favorable resolution of Allstate's other arguments, it is ultimately fatal to the carrier's argument about "necessary" equipment. The technologies were plainly "necessary" to this relevant "service performed by an employee of [Pilot]" because the agreements made them essential and indispensable to that task—the agreements contemplated and required that "Adjusting Services" would be provided with and through the cell phones, laptops, systems, and other technological assets with which Pilot was obligated to furnish its employees.

█ Founded as it is on an erroneous underlying premise or focus, Allstate's contrary construction is simply not sustainable here. Allstate concedes that it did not provide the required technological equipment to Pilot's "outside" adjusters. Consequently, the district court did not err in holding that Allstate failed to meet its burden with respect to sales taxes paid in connection with its purchases of the services of Pilot "outside" adjusters. However, in the alternative to its broader arguments concerning the meaning of "all supplies and equipment necessary" Allstate reminds us that it did provide required equipment to the Pilot "inside" adjusters who worked inside the carrier's own facilities. It also refers us to evidence that quantifies the amount of sales tax it paid in relation to these "inside" adjusters as $2,304,397.37. At least to the extent of its refund claims concerning the "inside" adjusters, Allstate urges, it conclusively established the "all supplies and equipment necessary" requirement. We agree, and the Comptroller does not appear to contend otherwise.

## CONCLUSION

The foregoing holdings establish that, as a matter of law, Allstate satisfied each of the requirements of Tax Code Section 151.057(2) with regard to its claims for refund for sales taxes paid on its purchases of the services of the aforementioned Pilot "inside" adjusters. However, as to Allstate's other refund claims, the district court did not err in holding that Allstate had failed to satisfy Section 151.057(2)'s "all supplies and equipment necessary" requirement, properly construed. Accordingly, we reverse the district court's judgment in part and render judgment for Allstate awarding it a refund

---

**70.** Tex. Tax Code § 151.057(2) (emphasis added).

in the total amount of taxes it paid on the services of Pilot "inside" adjusters, $2,304,397.37, plus the statutory interest authorized by Tax Code Section 112.155.[71] We otherwise affirm.

Former Chief Justice Jones not participating

---

71. *See* Tex. Tax Code § 112.155. The parties stipulated that Allstate would be entitled to this interest if it prevailed on its refund claims.